Robert FLEMING, Appellant,

v.

The STATE of Texas, Appellee.

No. 3–87–060–CR.

Court of Appeals of Texas,
Austin.

Nov. 6, 1991.

Rehearing Overruled Dec. 10, 1991.

Discretionary Review Refused
March 4, 1992.

Art Keinarth, Smithville, for appellant.

Forrest L. Sanderson, Asst. Crim. Dist. Atty., Bastrop, for appellee.

Before CARROLL, C.J., and ABOUSSIE and KIDD, JJ.

PER CURIAM.

This is an appeal from a judgment of conviction for aggravated sexual assault. 1983 Tex.Gen.Laws, ch. 977, § 3, at 5312 (Tex.Penal Code Ann. § 22.021, since amended). The punishment is imprisonment for fifty years.

Appellant's first seven points of error complain of the admission in evidence of two videotaped interviews with the complaining witness and of the overruling of appellant's objections to hearsay testimony. In an unpublished opinion filed September 21, 1988, this Court found that these points of error either were not preserved for review or presented harmless error. We sustained appellant's points of error eight, nine, and ten, finding that the district court erred by instructing the jury on the law of parole pursuant to 1985 Tex.Gen.Laws, ch. 576, § 1, at 4446 (Tex.Code Crim.Proc.Ann. art. 37.07, § 4, since amended). *Rose v. State*, 752 S.W.2d 529, 552 (Tex.Crim.App. 1988) (opinion on rehearing). Accordingly, we reversed the judgment of conviction and remanded for a new trial as to punishment.

On appellant's petition for discretionary review, the Court of Criminal Appeals reversed this Court's judgment and remanded the cause for reconsideration of points of error one through seven. *Fleming v. State*, No. 1245–88 (Tex.Crim.App., June 5, 1991) (not published).

*Evidence*

The victim was four years old and a member of appellant's household at the time of the offense. On May 20 and June 27, 1986, she was interviewed on videotape by Georgia Compton, an investigator employed by the Bastrop County district attorney's office. Neither appellant nor his attorney were present at the videotaping. At trial, the State introduced both videotaped interviews in evidence over appellant's objection. 1983 Tex.Gen.Laws, ch. 599, § 1 at 3828 (Tex.Code Crim.Proc.Ann. art. 38.071, since amended).

During the May 20 interview, the child related that appellant once placed his finger in her vagina while her mother was away at work; that appellant's action was painful and frightening, and caused her vagina to bleed; that appellant was unclothed at the time; and that he asked her not to tell anyone about the occurrence. In the June 27 interview, the child related that appellant undressed in front of her "a lot of times"; that on one occasion, while her mother was at work, appellant put his finger in her vagina and anus; that this was painful; that she asked him to stop but he did not; that he was unclothed at the time; that both of them touched his penis; and that he threatened to spank her if she told anyone "what he did."

In addition to the videotape, the State called eight "live" witnesses during its case-in-chief. The child herself testified, in relevant part, that appellant "touched" her and that she no longer wanted to talk to him because he "hurt" her. Georgia Compton testified that she had spoken with the child on several occasions after the videotaping and that the child had never wavered in her description of the assault or the perpetrator. Compton testified further that she had seen the child exhibit "a tre-

mendous amount of fear" when in appellant's presence.

The child's mother testified that she and the child lived with appellant in Elgin from March 1985 to May 16, 1986. At first, the child was very fond of appellant and referred to him as "daddy." In August or September 1985, however, there was a marked change in the child's behavior:

Q. [W]hat types of behavioral change did you observe in the little girl?

A. Okay. She got to where she didn't want to talk in front of [appellant], and she would cry. When he would be in the room she would shut up. She begged me that she didn't want to live there anymore, and that she wanted to live with her [grandmother].

Q. What else did you observe?

A. Constant complaining of her pee-pee hurting, or her butt hurting. She didn't have no appetite. I could not get her to eat.

. . . .

She was obsessed with [appellant] not seeing her naked, which she hadn't been, it didn't matter to her because she was just little. And when she was in the bathroom she wanted to lock the door. She didn't want it open.

She didn't have a kid attitude anymore; she didn't play with other kids. She was their boss. She would tell them if they didn't do what she said that she wasn't going to play with them.

. . . .

She masturbated in front of people. It was like she didn't realize people were there. You could look at her but you could tell that she didn't even know you were looking at her. And when I would ask her what she was doing she would say "Oh, I was scratching my leg," or "I wasn't doing nothing."

. . . .

And she got to where she was wetting the bed, which she had not done since she was potty trained when she was about two and a half years old. She would have a bad nightmare and I would wake her up and ask her what it was, what was she saying, why was she screaming, and she would say "[N]othing," and she just wanted to go back to sleep.

. . . .

Q. [D]id she do anything or change in her behavior toward Robert Fleming, in particular, besides these things you've talked about?

A. Just that she doesn't want to be alone with him. We have the third or fourth apartment down from the end of the street, and she would chase me. She would start chasing me and begging me to take her to work, or don't go to work, or take me to [her grandmother's house].

And he would walk out the door and she would stop and she would walk back up there.

Q. Give the jury some idea of how long this behavior pattern persisted. You've already said that it started in August—late August or early September of 1985. About how long did this continue?

A. Well, even after I quit working she didn't go back to the way she was. She calmed down a lot, but she didn't want to be left alone with him, and she was still complaining about her pee-pee and her butt.

Q. Did you ever ask her "[W]hat in the world was wrong with you?" Did you ever try to find out?

A. Yeah. And she would just say, "[N]othing." I would say "[H]as anyone ever done anything to you that you didn't like?" And she said "[N]o."

Q. Now I want you to kind of flip the coin, if you will, and tell the jury what changes, if any, you observed in the way Robert Fleming behaved toward the little girl?

. . . .

A. Before, he was real persistent that I not give in to her. She was a spoiled kid. She was a very spoiled kid and would throw fits. And he was persistent that I not give in to her when she would throw those fits, and then I noticed that he started to give in. And he would say, "[W]ell, she's going to

end up getting her way anyway, so why fight about it."

And he would go buy stuff that when she didn't even need it. He would go out and buy her clothes; and she had a closet full of 'em. And toys, for no reason, it wasn't her birthday and she didn't do anything spectacular. I don't know, it was different.

. . . .

Q. Over this period of time was Robert Fleming ever left alone with the little girl?

A. On several occasions.

Q. Was there anybody else, any other male figures, that were left alone with the little girl over an extended period of time?

A. Not to my knowledge.

Q. Okay. You have already testified that you tried to get some answers by talking to the little girl and that she wouldn't open up to you. What action did you finally take, later on, to find out what was wrong with her?

. . . .

A. I asked [my sister, Carla] if she would talk to [the child] and find out if anyone had ever done anything to her, and Carla said, "[Y]eah, I will."

Q. Before you go any further, just very, very briefly, give the jury a background of where Carla Moses fits into the picture, and where she lives at this time and what type of relationship she has with [the child].

A. Okay, she lived right next door. And her and [the child] have been real close. . . .

Q. Okay, now, tell us exactly what date, if you can recall the date, that Carla actually talked to [the child].

A. On May the 16th, [1986].

. . . .

Q. Okay. And Carla had a conversation with her—and how did you learn of this conversation?

A. Ray Grady came up to my job and said you need to come home.

Q. And who was Ray Grady?

A. That was her boyfriend at the time and now it's her husband.

Q. Okay. And Ray Grady came and told you the conversation?

A. He didn't tell me the conversation, he just said that [the child] was telling some pretty horrible things, and that I needed to get home.

Q. Okay, and what did you do?

A. I rode back to Elgin with him.

Q. Okay. And after you got back there did you have conversation, also, with [the child]?

A. Yeah.

Q. Who all was in the room?

A. Carla was in there. She wasn't in there the whole time, I would say maybe twenty minutes.

. . . .

Q. Tell us exactly what the little girl told you.

A. Okay. I went in there where Carla and [the child] were and I said "[D]o you have something you need to tell me?" She was acting very strange. She would look at me and then look away and hold her head down and look up at me; she tried to stay away from me.

I said, "[W]hy don't you come sit over here with me?" And I said, you know, "[W]hatever you've got to tell me I'm not going to be mad at you, I promise, but if something happened you really need to tell me like you did Carla."

And Carla said "[Child], it's important that you tell your mom what you told us." And so she started slowly saying what happened. She said Bob had hurt her, and I said, "[H]ow did he hurt you?"

. . . .

Q. Okay, be as specific as you can possibly be when you tell the jury what happened. Go ahead and continue.

A. And I said, "[H]ow did he hurt you?" And she said, "[H]e stuck his finger up my pee-pee."

Q. I'm sorry, I need to interrupt you again. Explain to the jury at this point what her words are for her private parts.

A. Okay, her pee-pee is her vagina; and her tushie, she also calls her tush her butt.

Q. I'm sorry to interrupt you, you may continue.

A. And I said, "[W]ell, did he touch it or what?" And she said, "[N]o, he moved it in and out." And she showed me he was going like this (demonstrating). And I said, "[W]ell, is that all he did?" And she wouldn't answer me.

I said, "[W]hat was he doing with his other hand, was he holding your hand, or was he pushing your hair back, or what was the other hand doing?" And she said, "[I]t was on his wienie." And I said, "[W]ell, was he just touching his wienie, holding it, or what was he doing?" And then she showed me he was going like this (demonstrating in an up and down motion), masturbating.

Q. Is that all you can remember? If so, that's fine.

A. She didn't know what to say. I asked her, I said, "[W]ell, you know, why didn't you tell me? Did he say he would hurt you if you started crying?" And she said, "[W]ell he already hurt me." And I said "[W]hy didn't you tell me?" And she said, "[W]ell, because he would hurt us. And kill you."

. . . .

Q. Did she ever suggest at any time, since that date, that anybody else had done this to her?

A. No. Well, at one time she was dreaming—she was having a lot of bad dreams, and we talked about it, and she said, "I know I must have dreamed that." And I asked her, I said, "[D]o you think you probably could have dreamed that Bob did all this to you?" She said, "[N]o, I didn't dream that he did that."

Q. Okay. Can you describe [the child's] perception of Robert Fleming now, or her attitude towards him?

A. She is scared to death of him.

Q. Is she scared to death of any other male that you know of?

A. No.

The child's maternal grandmother also testified that the child's behavior changed noticeably around September 1985:

Q. Well, just describe to the jury what you were able to observe in the way of relationship to this young girl and [appellant], right at the very first?

A. Well, she liked him. In fact, she called him daddy.

Q. Would you describe it as being a warm and loving type of relationship?

A. Yes.

Q. Did it remain that way indefinitely?

A. No.

Q. When did you first observe things beginning to change?

A. I don't remember the date but it was when they moved to Hillside. That was approximately September; somewhere along in there.

Q. September of what year?

A. In '85.

Q. Okay. I want you to describe now, for the jury, what you were able to observe in the changes in [the child]. . . .

A. Well, first of all, it was when she would stay with me, come out to my house and stay with me. She didn't want to go home. She didn't want to go home at all. In fact she got to where [she] would ask me if she can live with me.

[The child's mother] was working at Bob's dad's store, and I would watch her during the day, and when I would go to take her home during the evening, she would beg me not to take her home. She would get very upset, and she would cry and just hold on to me.

Q. At the time, would she ever tell you why?

A. No. I asked her why. I said, "[W]hy don't you want to go home, mama will be home about ten?" And she would say, "Let mama come get me."

Q. And who would be actually coming to pick her up, or would you take her to—

A. I would take her to her house.

Q. Okay, and so who would be the only person in that house with her at that time?

A. Bob.

....

Q. Did you notice any changes in the behavior of Robert Fleming during this period of time?

A. I noticed that he didn't look at me when I went to their house.

Q. What about his relationship to the little girl? Did you notice anything, or were you rarely there at the time?

A. The thing that I noticed more than anything was that he kept buying her things. I mean lots of things, clothes, and he bought her flowers on occasion. He just kept buying her things, and I kept asking [the child's mother] why is he buying all these things. She said, "Well, I don't know, I guess he wants to."

Q. And that was after I think you said September of 1985?

A. Yes, sir.

Q. Have you had any personal conversations with the little girl where you tried to open her up to you and tell you exactly what was going on?

A. I had asked her to. That's after this came up. I had questioned her before and she never said one word to me.

Q. But you could tell something was wrong?

A. I knew something was wrong.

Carla Moses Grady, the child's maternal aunt, testified that she spoke with the child on May 16, 1986:

Q. I want to turn your attention to May 16 when you had that conversation. And let me just ask you, tell me exactly, and tell the jury, what the child told you.

A. Well, that night I had put the kids to bed and Ray Grady, my husband, was talking to her and he told me he would like for me to come in and help talk to her. So I went in there and I just sat down with her and started asking her if anybody had ever hurt her. And she said her daddy did. She called Bob Fleming her daddy.

She said that he had hurt her, and I said, "[H]ow?" And she said he stuck his finger up her pee-pee. I said did he stop, and she said, no, that he just kept doing it until it started bleeding.

And then, I had asked her if he done anything else, if he had made her touch his wienie? And she said, no, that's all he done. And she said that was their secret.

....

Q. Later on the night, did [the child's mother] come home?

A. Yea ... Ray went up to where [the child's mother] was working because he thought Bob might have gone up there and cause some trouble or something.

Q. We have already had the testimony of [the child's mother], and she talked about the conversation that she then had with the little girl. Were you present during any of the conversation?

A. Just when—uh—she wanted me to stay in the room until, you know, [the child] started talking to her mama. And then when she started talking to her I left the room and she finished telling her mama.

Q. And you said when she started talking to her mother—

A. Uh-huh.

Q. —are you telling the jury that what she was saying was repeating, basically, to her mother what she had already told you?

A. Uh-huh.

Dr. Jeff D. Ezell, a psychologist, testified that he had worked with sexually abused children for ten years, and that he had examined the complainant on October 6, 1986. From the beginning of the examination, the child's behavior was "not normal": "[She] intruded herself very closely into my own space, if you will; rubbed herself against my legs; and I had to repeatedly admonish her to get back in her seat.... She was rather highly agitated; she flipped her dress up; rubbed her crotch; and exposed her panties." Various psychological

tests administered to the child revealed that

this child, at the time I saw her, was very preoccupied with a sense of threat in her environment, of fears, of aggressive retaliation. I felt she was highly sexually preoccupied....

....

Q. Doctor, putting all this together now, for the jury, and in summarizing your finding, were you able to reach an opinion as to whether or not this child had been sexually abused?

A. Based on her presentation, there was absolutely no doubt in my mind that this child was sexually abused.

Q. Did she appear to you to have any confusion as to who the perpetrator was?

A. [S]he did, on several occasions, identify the perpetrator as a character named Bob, and seemed intent on that. There wasn't any contradictions in the story as she related it.

Q. By that I take it to mean she never identified anyone else other than this Bob character?

A. That's correct?

....

Q. Would you describe the ability of a child of this age, four or five years old, maintaining a continued deception of something as important as who that perpetrator is, for a long period of time, over psychologists, therapist, family members and that sort of thing?

A. I think that's quite unlikely. Typically, where there is some coaching or rehearsal or fabrication, which is strongly suspected or does indeed come to light, the child verbalizes many inconsistencies, becomes very reluctant to make statements at all, or makes them in a mechanical parrot-like fashion....

....

Q. Doctor, in your opinion was this little girl making up this story?

A. I don't think that she was fabricating the fact of sexual abuse. I have, myself, no doubt that this child was sexually abused in a fairly severe and probably a rather chronic way.

Dr. Beth Nauert, a pediatrician, testified that she interviewed and physically examined the child on June 5, 1986:

Q. Would you tell the jury exactly what the little girl told you?

A. Yes, sir. I interviewed [the child] alone, and I asked her to tell me about any touching trouble that she had had. And she told me that she had had some trouble with Bob; and I asked her, "[W]ho is Bob?" And she said, "[H]e's my daddy, but he's not my daddy anymore."

I asked her to tell me what she meant by this, and she said, "Bob touched my pee-pee and my butt with his finger. He took my clothes off; he took off his pants and his underwear. He touched his wienie with his fingers."

I asked her if this occurred once or a few times or a lot of times, and she told me this had happened "[A] lot of days at my grandma's house and at our other house."

Q. Did she ever, during this interview, suggest to you that possibly somebody else might have been involved in touching her?

A. No, sir, she didn't. She did not list any other person or name anyone else.

Q. In your professional experience, did she seem at all confused as to who the perpetrator might be?

A. No, sir, she didn't. She seemed very clear about that.

Dr. Nauert's physical examination of the child' genital and anal areas revealed abnormalities that made it "more likely than not that this child has been sexually abused."

Ann Elizabeth Stanley, a Travis County mental health therapist, testified that she had worked with approximately 300 sexually abused children:

Q. What types of things do [these children] do in terms of behavior patterns that are unusual?

A. There is a whole range of things. Children who have been victims of sex-

ual abuse at that age, you can expect that they are going to [be] acting out a whole bunch. That they are going to be testing limits. A lot of times children at that age will have a real poor sense of boundary. They may come into my office and just come right up and sit on my lap; look through the drawers of my desk. You tend to see a whole lot of anxiety and fear.

As far as watching them with their peers, you might see them fall into a victim behavior, set themselves up to be the victim. Or you might see them take on more of the perpetrator role; and maybe sexually act out with other kids.

On the other hand, a lot of the kids withdraw and become real quiet and depressed. And then there are children who exhibit both, who act out. At one time they are real quiet and depressed. We expect to see a lot of regressed behavior, children who have stopped wetting the bed all of a sudden start wetting the bed again; thumb sucking, after they've stopped for years; nightmares; throwing all kinds of temper tantrums.

. . . .

Q. Is it common for young children to lie about having been sexually abused?

A. No.

Q. Is it common for them to be confused about who the perpetrator is?

A. No.

. . . .

Q. How do the small children normally act toward the perpetrator after the event has occurred?

A. I would say, normally, they act quite fearful of that person.

Stanley testified further that she had spent 21 therapy sessions with the child:

Q. What factors did you consider in reaching your diagnosis?

A. Well, first was the lack of boundaries. That is, [the child] crossing boundaries and coming into my space. That was indicative of sexual abuse. The other part of that was her extreme fear that she was able to verbally say

it to me. That was also something she could talk to me about verbally, and she represented it through play, also. Along with that were some other symptoms of sexual abuse. She talked about a lot about her vaginal area hurting; her stomach hurting. And that is very common for children who have been sexually abused.

. . . .

Q. I think you've already stated your opinion, but let me ask you, what is your opinion as to the cause of this young girl's abnormal behavior?

A. That she had been sexually abused.

Q. Do you have any doubt, in your own mind?

A. No, I have no doubt.

Q. Okay. I want to ask you now exactly what the little girl told you, as to part of your diagnosis? What type of statements did she make to you?

A. She made statements as far as the nature of the abuse; in that she made statements as to "Bob touched my pee-pee," "Bob put his finger in my pee-pee," "Bob touched my pee-pee with his wienie."

. . . .

Q. Would you give the jury some idea of what level of consistency her reports to you would be, in talking about the sexual events that happened?

A. Very consistent.

Q. Did she appear, at any time, to be confused or uncertain about who the perpetrator was?

A. No.

Q. What degree of detail did [she] use?

A. She could . . . give lots of feeling associated with the abuse. And she could talk about circumstances surrounding the abuse. That is, she could talk about why she didn't tell, why she was scared to tell, she—

Q. And why was that? Why was she scared . . . to tell?

A. She had a couple of different reasons. One reason was that she was scared her mom would be mad at her and give her a whipping. Another rea-

son was that she said Bob threatened to—I'm using my own words now, but she said Bob had threatened to kill her and her mom with a knife. That was another reason that she gave me.

### Videotape

■ In points of error one and two, appellant contends that the district court erred by admitting in evidence the two videotaped interviews. On original submission, we agreed that the admission of the videotapes was error, but concluded that the error was harmless. *Long v. State*, 742 S.W.2d 302 (Tex.Crim.App.1987). We have been instructed by the Court of Criminal Appeals to reconsider these points of error in light of *Briggs v. State*, 789 S.W.2d 918 (Tex.Crim.App.1990).

In *Long*, the Court of Criminal Appeals held that former art. 38.071, authorizing the use of videotaped testimony by children in certain cases, was unconstitutional on its face. The court held that the statute denied defendants their constitutional right of confrontation because cross-examination during the videotaping was impossible. 742 S.W.2d at 317–18. The court also concluded that the statute violated the guarantees of due process and due course of law by exposing the accused to the choice of relinquishing his right to call the child victim to the stand to test her credibility or risking the wrath of the fact finder for subjecting the child to the very trauma the statute was supposed to prevent. 742 S.W.2d at 321. Finally, the court found the statute fundamentally unfair because it permitted the State to introduce its primary evidence twice by allowing both the live and videotaped testimony of the child victim. 742 S.W.2d at 322.

*Long* was partially overruled in *Briggs*. In that case, the Court of Criminal Appeals concluded that because former art. 38.071 required that the child be available to testify at trial, the statute did not facially deny the right of confrontation. The court further noted that if the State called the child to the stand and, after a few preliminary questions, passed her for cross-examination, the State would neither duplicate its

case nor force the accused to endure the stigma of calling the child to the stand. 789 S.W.2d at 922. Because the statute could be constitutionally applied, it was not facially unconstitutional. We now must determine whether the statute was constitutionally applied in this cause.

The State called the complaining witness to the stand after showing the videotapes to the jury. After securing her promise to tell the truth, the prosecutor passed the witness for cross-examination. This procedure was consistent with that deemed constitutional in *Briggs*. The child was available for cross-examination, appellant was not forced to call her to the stand, and the State did not use the child's live testimony to duplicate her videotaped testimony.

Nevertheless, appellant argues that throughout the trial the State attempted to expose him to the "wrath of the fact finder" by blaming him for the child's presence in court. Appellant draws our attention to the following incidents.

1. During his opening statement, the prosecutor told the jury that the "little girl has been traumatized, and she will probably have to go through an additional trauma of trial itself."

2. While questioning one of the psychologists who evaluated the child, the prosecutor asked "what will the trial setting do to this particular individual, the young child, especially if she has to testify?" The witness answered that he "had great concern about that," that "every effort should be made to minimize any further testimony ... of this child," and that "such courtroom exposure would very likely set her back."

3. After calling the child to the stand and asking his preliminary questions, the prosecutor stated, "Your Honor, with great reluctance, we will now pass the witness."

4. During final arguments, the prosecutors referred to the child "having to be confronted with this before all these strange people," and asked that the jury "not hold it against us, here in the D.A.'s office, for sparing that little girl

as much harm as we could spare her. And the way we did, of course, was by using the video tape, and on re-direct examination limiting our questions to as few as we possibly could."

Appellant contends that by these remarks and questions, the State sought to make a trial issue of the trauma to the child resulting from her having to testify, and attempted to place on him the blame for her presence in court.

■ While we find some merit in appellant's contention, we do not believe that the propriety of the prosecutors' trial tactics is a matter properly before us for review. The question before us is whether the admission of the videotapes denied appellant his constitutional rights of confrontation, due process, and due course of law. Appellant objected to the videotapes on this ground. He did not object to the comments of the prosecutors on this or any other ground.

We hold that former art. 38.072 was constitutionally applied in this cause. Points of error one and two are overruled.

### Hearsay

In points of error three through six, appellant contends that the district court erred by admitting the hearsay testimony of the child's mother, Carla Grady, Beth Nauert, and Ann Stanley. In the complained-of testimony, each witness testified to statements made by the child describing the assaultive acts committed against her and identifying appellant as her assailant. On original submission, we determined that appellant did not preserve points of error three and four for review. We assumed without deciding that the testimony at issue in points of error five and six was inadmissible hearsay, but concluded that the error was harmless in light of the other testimony. The Court of Criminal Appeals held that points of error three and four were preserved for review, and instructed us to reexamine all four points of error.

### A. Outcry

The State advances three theories to justify the admission of the challenged testi-

mony. First, the State urges that the testimony of the child's aunt, Carla Grady, was admissible under the terms of Tex.Code Crim.Proc.Ann. art. 38.072 (Supp.1991). This statute creates an exception to the hearsay rule for statements made by a child abuse victim describing the alleged offense, if the witness is the first adult to whom the child made such statements. *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim.App.1990). Grady was that person in this cause. But as we noted on original submission, the State's reliance on art. 38.-072 is misplaced because it failed to lay the procedural predicate required by the statute. *Long v. State*, 800 S.W.2d 545 (Tex. Crim.App.1990). Point of error three is sustained.

### B. Prior consistent statement

■ The State argues that the testimony of the child's mother was not hearsay because it was admitted not to prove the truth of the matter stated, but to prove that the child was consistent in her identification of appellant as her assailant. The admissibility of a prior consistent statement by a witness is governed by Tex. R.Crim.Evid.Ann. 801(e)(1)(B) (Pamph. 1991). *See also* Tex.R.Crim.Evid.Ann. 612(c) (Pamph.1991). Under Rule 801(e)(1)(B), a witness's prior consistent statement is admissible to rebut an express or implied charge of recent fabrication or improper influence or motive.

■ In this cause, appellant's primary defense was that the child's accusations against him were the product of improper influence by her mother and other members of her family. Thus, the predicate for admitting a prior consistent statement was established. But to be admissible under the rule, the prior consistent statement must antedate the improper influence or motive to fabricate. *Campbell v. State*, 718 S.W.2d 712, 715–17 (Tex.Crim.App. 1986); 33 Steven Goode *et al.*, *Guide to the Texas Rules of Evidence: Civil and Criminal* § 801.4 (Texas Practice 1988). None of the hearsay statements at issue in this appeal were shown to have been made by the child before the alleged improper influ-

ence was brought to bear on her. Point of error four is sustained.

### C. Medical diagnosis and treatment

■ The State argues that the hearsay testimony of Beth Nauert and Ann Stanley was admissible under Tex.R.Crim.Evid. Ann. 803(4) (Pamph.1991). Rule 803(4) creates an exception to the hearsay rule for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

The medical treatment exception to the hearsay rule is based on the assumption that the patient appreciates that the effectiveness of the treatment may depend on the accuracy of the information provided to the physician. *McCormick on Evidence* § 292 (Edward Cleary, ed., 3d ed. 1984). For very young children, however, such logic may break down. A four-year-old child, such as the victim in this cause, may not understand the need to be truthful with a physician, nurse, or other care-giver. John Myers, *Child Witness Law and Practice* § 5.36 at 358 (1987).

Although no specific inquiry was made in this cause to determine whether the child appreciated the need to be truthful in her statements to the doctor and psychologist, the record is sufficient to support such a conclusion. Nauert testified that she interviews children suspected of being sexual abuse victims before conducting her physical examination. She stated that in such interviews she "look[s] primarily for not only for what the child tells me but how this—whether they seem to be—whether they seem to be confused or whether they seem to be sure of what they're saying." Nauert testified that the victim in this cause exhibited no confusion. Stanley testified, "It was my experience that her mother encouraged her to talk to me about what happened to her. To always be honest with me. I never got [the] idea that she was being coached or that she was

parroting what somebody else said to her...."

To be admissible under Rule 803(4), the statement must be reasonably pertinent to diagnosis or treatment. "Statements as to fault would not ordinarily qualify under this latter language. Thus a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light." Fed.R.Evid. 803(4) advisory committee's note. As our Rule 803(4) is based on and identical to the federal rule, it follows that it was adopted with this understanding. That is the assumption of the commentators. Goode, *supra,* § 803.9; 1A Roy R. Ray, *Texas Law of Evidence Civil and Criminal* §§ 842, 843 (Texas Practice, 3d ed. 1980 & Supp.1991).

A number of courts adhere to the view that, in prosecutions for child sexual abuse, the child's identification of the abuser is not admissible under the medical exception to the hearsay rule. But a growing majority of courts find the medical exception to be applicable. Myers, *supra,* § 5.36 at 359–60 (1987 and Supp.1991). These courts reason that, unlike ordinary medical problems, the treatment of child abuse includes removing the child from the abusive setting. Thus, the identity of the abuser is pertinent to the medical treatment of the child. *Id.* The opinion most often cited in support of this view is *United States v. Renville,* 779 F.2d 430 (8th Cir.1985). The Texas courts addressing this question have ruled in favor of admission. *Tissier v. State,* 792 S.W.2d 120, 125 (Tex.App.1990, pet. ref'd); *Macias v. State,* 776 S.W.2d 255, 258–59 (Tex.App.1989, pet. ref'd). *See also In re L.S.,* 748 S.W.2d 571, 576 (Tex. App.1988, no writ) (applying civil rule).

We conclude that the child's statements to Nauert and Stanley describing the abusive acts and identifying the abuser were reasonably pertinent to medical diagnosis and treatment, and were properly admitted pursuant to Rule 803(4). Points of error five and six are overruled.

### Harm

■ In his seventh point of error, appellant contends that the cumulative effect of

the erroneously admitted hearsay evidence discussed in points of error three through six denied him a fundamentally fair trial. We have overruled points of error five and six. We will limit our discussion under this point of error to the question whether the erroneous admission of the hearsay testimony of the child's mother and aunt was harmless error. Tex.R.App.P.Ann. 81(b) (Pamph.1991).

When applying the harmless error rule, a reviewing court should not focus on the propriety of the outcome of the trial. Instead, it should be concerned with the integrity of the process leading to the conviction. *Harris v. State*, 790 S.W.2d 568, 587 (Tex.Crim.App.1989). Among the factors to be considered are: the source of the error; the nature of the error; whether and to what extent the error was emphasized by the State; the collateral implications of the error; how much weight a juror would probably place upon the error; and whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.*

The erroneously admitted hearsay testimony of the child's mother and aunt, relating what the child told them of appellant's activities, was essentially identical to the properly admitted hearsay testimony of the pediatrician and psychologist. In addition, the jury saw the videotaped interviews with the child, in which she also described the offensive behavior and identified appellant as the abuser. Without minimizing the impact of the improper hearsay, in particular that of the aunt to whom the child first described the abuse, we are satisfied that the State's case would not have been less persuasive without the erroneously admitted testimony. *See Offor v. State*, 749 S.W.2d 946 (Tex.App.1988, pet. ref'd). The prosecutors did not give any particular emphasis to the improper hearsay during argument. To the contrary, the prosecutors placed their greatest emphasis on the child's behavior in court and on the videotape, and on the testimony of the various expert witnesses.

We do not believe that declaring the errors harmless will encourage the State to repeat them with impunity. We note in particular that Grady's hearsay testimony was almost certainly admissible under art. 38.072, had only the prosecuting attorneys been familiar with the procedural requirements of the statute. In many, if not most, cases of child sexual abuse, the testimony of the "outcry" witness will be of far more importance than it was in this cause. It is unlikely that prosecutors will deliberately fail to lay the procedural predicate for this testimony.

We find beyond a reasonable doubt that the erroneous admission of the hearsay testimony of the child's mother and aunt did not contribute to the conviction or punishment. Point of error seven is overruled.

Because of the error at the punishment stage identified in our previous opinion, the judgment of conviction is reversed and the cause is remanded to the district court for a new punishment hearing. Tex.Code Crim.Proc.Ann. art. 44.29(b) (Supp.1991).

Reversed and Remanded on Remand.