# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00396-CR

**Jerry Graham, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF CALDWELL COUNTY, 421ST JUDICIAL DISTRICT NO. 2004-247, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

The jury convicted appellant Jerry Graham of the offenses of sexual assault of a child and indecency with a child. *See* Tex. Pen. Code Ann. § 22.011(a)(2)(C) (West Supp. 2005) (sexual assault of a child); § 21.11(a)(1) (West 2003) (indecency with a child). In three issues on appeal, Graham contests: (1) the admission, through the medical records exception to the hearsay rule, of the complainant's hearsay statements to a counselor; (2) admission of the counselor's opinion testimony regarding the reasons for the complainant's delayed outcry; and (3) the factual sufficiency of the evidence to sustain the sexual assault conviction. We will affirm the judgment of the district court.

## BACKGROUND

The jury heard evidence that 15-year-old G.M. was sexually assaulted by Graham, her stepfather. G.M. testified that on two separate occasions, at night while G.M. was sleeping,

Graham came into her bedroom and "licked" her breasts and her genitals. We will review the evidence concerning the nature of Graham's acts as necessary when addressing Graham's sufficiency challenge.

The incidents in question took place in January and April 2004. G.M. testified that she informed her mother, Victoria Graham, about the incidents two days after the last one had occurred. Victoria testified that she confronted Graham about G.M.'s allegations, and that he denied them. The following day G.M. told her friend Rachel about what had happened. Rachel testified that she told G.M. to tell their friend Natasha's mother about what had happened. Natasha's mother worked as a dispatcher for the Luling Police Department. G.M. recounted that Rachel and Natasha's mother took her to the police station. At the station, G.M. first spoke with Officer Joe Earle, a traffic patrol officer. Officer Earle testified that once G.M. began telling him what had happened to her, he immediately contacted Officer Jeff Goff, the investigator on duty. Earle testified that once Goff arrived, Goff began interviewing G.M. and told Earle to contact Child Protective Services (CPS).

While the officers were waiting for CPS, Graham and Victoria arrived at the police station looking for their daughter. They were accompanied by G.M.'s younger sister. Earle testified that he asked Graham to go outside with him. Earle testified that Graham followed him outside and that Graham stated, "I know exactly what's going on" because Victoria had told him about G.M.'s allegations. Earle testified that he responded to Graham that the allegations were "under investigation," that Graham was not being detained, and that he was free to leave at any time. Earle testified that Graham did not leave.

Officer Goff testified that when he interviewed G.M. she was "nervous, timid," and that she was "biting her fingernails and didn't really want to talk." Goff testified that he interviewed

2

G.M. for approximately 10 to 20 minutes but did not ask her very detailed questions. He arranged for G.M. to be transported to Roxanne's House, a children's advocacy center, for a comprehensive interview. Goff testified that he observed the interview at Roxanne's House via closed-circuit media, and that what "emerged from that interview" was consistent with what G.M. had told him earlier. Goff also testified that he interviewed Victoria and G.M.'s sister the same night he interviewed G.M., and that he later obtained statements from G.M.'s friends Rachel and Natasha, and Natasha's mother.

Sammye Sessions, the CPS supervisor for Hays and Caldwell Counties, responded to the call from the Luling Police Department. She testified that she went to the station and interviewed G.M., G.M.'s sister, and their mother. Sessions testified that after speaking with each of them, she obtained permission from her superiors to perform an "emergency removal" of both girls from their parents' custody. Sessions also observed G.M.'s interview at Roxanne's House, and testified that G.M.'s statements during the interview were consistent with what G.M. had told her. Sessions also testified that it was common for children to have trouble recounting specific details of sexual abuse.

The jury also heard testimony from Gene Hartin, a licensed professional counselor. Hartin testified that in August 2004, G.M. was referred to him for therapy on several issues, including sexual abuse. Hartin was G.M.'s therapist for approximately 10 months. Hartin testified that after a "few months" of therapy, G.M. told Hartin that Graham had sexually abused her on three occasions—once by "rubbing" her vagina, and two other times by "licking" her vagina. Hartin also testified that G.M. had a low IQ in the range of 70 to 80, with 100 being the "average IQ of the general population." Hartin explained to the jury, without objection, that G.M.'s age and "definitive

3

cognitive mental deficiencies" could have contributed to her not being able to recall specific details of the sexual abuse. Hartin further testified, again without objection, that, in his opinion, G.M. delayed making her outcry against Graham because doing so "would create a major disturbance in the family that would impact on her mother's happiness."

Graham was indicted on two counts of sexual assault of a child and two counts of indecency with a child. Graham was first tried on these charges in April of 2005, but the jury could not reach a verdict, resulting in a mistrial. In the second trial, the jury convicted Graham of all four counts. Graham pleaded true to a prior conviction for aggravated sexual assault of a child, and the court assessed punishment at life imprisonment. This appeal followed.

## DISCUSSION

**Hearsay statements**

In his first issue, Graham argues that the district court erred in admitting the statements G.M. made to her counselor, Gene Hartin, under the medical diagnosis and treatment exception to the hearsay rule. *See* Tex. R. Evid. 803(4).

An appellate court reviewing a trial court's ruling on the admissibility of evidence must utilize an abuse-of-discretion standard of review. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). In other words, the appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990). In addition, the appellate court must review the trial court's ruling in light of what was before the trial court at the time the ruling was made. *Weatherred*, 15 S.W.3d at 542.

Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d).

4

Hearsay is not admissible except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority. Tex. R. Evid. 802. One such provision is the "medical diagnosis or treatment" exception, which allows the admission of hearsay "[s]tatements made for the purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Tex. R. Evid. 803(4). Rule 803(4) is based on the assumption that the patient appreciates that the effectiveness of the treatment may depend on the accuracy of the information provided to the physician. *Fleming v. State*, 819 S.W.2d 237, 247 (Tex. App.—Austin 1991, pet. ref'd).

In *Jones v. State*, this Court explained:

> The two-part test for admitting these statements [under rule 803(4)] is: (1) the declarant must make the statements for the purpose of receiving medical treatment, and (2) the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis. Thus, the declarant must first have a motive consistent with obtaining medical care, knowing that proper diagnosis or treatment depends upon the veracity of such statements. Further, the statement must concern facts that are reasonably pertinent to diagnosis or treatment: medical history, symptoms, or the cause or general character of the cause or external source.

92 S.W.3d 619, 622-23 (Tex. App.—Austin 2002, no pet.) (internal citations omitted). The policy rationale underlying this exception is that a statement made with the intent to obtain medical services, in the belief that proper diagnosis and treatment depends upon the truth of the statement, carries special guarantees of trustworthiness. *Id.*

Graham has not contended that Hartin is not a member of the medical profession or providing care within the scope of rule 803(4). *Cf. Jones*, 92 S.W.3d at 623 n.5; *see also Moore v.*

5

*State*, 82 S.W.3d 399, 405 (Tex. App.—Austin 2002, pet. ref'd). He challenges, rather, the district court's determination that G.M.'s statements were for the purpose of obtaining diagnosis or treatment and concerned facts reasonably related to those purposes. Graham emphasizes that Hartin's counseling concerned relationship issues and various topics other than sexual abuse. We have previously held that statements elicited during counseling regarding "relationship issues, [the complainant's] identity and self-esteem, the loss of [the complainant's] mother, [the complainant's] sexualized behavior in the classroom, and bad dreams [the complainant] had," or counseling seeking to "clarify exactly what is appropriate behavior and not appropriate behavior between a care-giving adult and child" lack the guarantees of trustworthiness upon which rule 803(4) was founded. *Perez v. State*, 113 S.W.3d 819, 827 (Tex. App.—Austin 2003, pet. ref'd); *Jones*, 92 S.W.3d at 626. Another factor on which we relied in *Perez* and *Jones* was that the statements were elicited over a period of several months—also the case here.

But our examination of the record reveals a closer question than in *Perez* and *Jones*. Before permitting Hartin to testify, the district court held a hearing under rule of evidence 104 at which the State elicited testimony concerning Hartin's treatment of G.M. as it bore upon rule 803(4):

> Q: And do the conversations you have with [G.M.] relate to diagnosing and treating the issues that led to her entering foster care?
>
> A: My understanding, at the time, is that [G.M.] and her sister were removed from her parents' care related to allegations that she had been sexually abused, and that has been a topic focus of concern since I've worked with her.
>
> . . . .
>
> Q: Okay. Has this been a topic of conversation often or occasionally or just a few times?

A: I would say frequently. Although, there are many other issues that we've focused on with [G.M.]

Q: Okay. Let me ask you specifically. Have you ever directly asked her about the circumstances relating to this sexual assault?

A: [G.M.] volunteered to me when I first met her that she had been sexually abused. At that time, she said she didn't really feel comfortable in talking about it, but that she would later.

Q: Okay.

A: So some time passed before I specifically returned to focus on that subject with her.

. . . .

Q: Okay. And what did she tell you at that time?

A: By that time, she was prepared to tell me what had happened —

Q: Okay.

A: — which is, of course, an important — an important step for them to discuss what happened.

Q: Is that — is knowing specifically what happened, important to be able to treat —

A: Yes.

Q: — her issues related to that?

A: Yes, it is.

Q: Okay. What exactly did she tell you?

A: She told me that she had been molested by her stepfather on three separate occasions —

Q: Okay.

A: — following the marriage of her mother with her stepfather.

Q: Okay.

A: She said that on each of these occasions, it occurred in her bed at night.

Q: All right.

A: She would awaken and — to find him doing — become aware that he was doing sexual things to her.

Q: Such as?

A: She said on the first occasion, I believe, that — I think the way she put it was, he was rubbing me —

Q: Okay.

A: — referring to her vagina.

Q: Okay.

A: On the other two occasions, she said that he was licking me down there —

Q: Okay.

A: — I believe is the way she put that.


Hartin went on to explain that a person's reaction to sexual abuse depends on many variables, including who the alleged perpetrator was:


Q: Okay. And does the degree and timing of reactions vary among people?

A: Yes. It could vary quite a bit. Often the major variables in helping some — in being able to understand a specific traumatic experience is that the depth of the effect has a lot to do with who the perpetrator was, if it was, for example, a stranger or if it was someone who is expected to be trusted, such as a family member or a friend. It makes it more difficult to deal with.

8

Hartin thus testified that his eliciting of facts concerning G.M.'s sexual abuse was an important part of her diagnosis and treatment. Further, he provided a treatment-related reason for the timing of her statements. *See Wilder v. State*, 111 S.W.3d 249, 257 (Tex. App.—Texarkana 2003, pet. ref'd) (statements by complainant to licensed professional counselor made over an extended period of time concerning sexual abuse admissible under Rule 803(4)). Hartin also testified that an important part of his work was ensuring that G.M. made truthful statements. We have held similar testimony to support admission of child sexual abuse victim statements under rule 803(4). *See Fleming*, 819 S.W.2d at 247.

However, we need not address whether the district court abused its discretion in admitting G.M.'s statements through rule 803(4) because, even if it did, any error was harmless. The erroneous admission of evidence is non-constitutional error. *Tate v. State*, 988 S.W.2d 887, 890 (Tex. App.—Austin 1999, pet. ref'd). Accordingly, we apply the harm analysis standard found in Tex. R. App. P. 44.2(b). *See Sexton v. State*, 93 S.W.3d 96, 101 (Tex.Crim.App. 2002); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Under this standard, the error must be disregarded unless appellant's substantial rights are affected. Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence

admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character

of the alleged error and how it might be considered in connection with other evidence in the case.

*Motilla*, 78 S.W.3d at 355. We may also consider the jury instructions, the State's theory and any

defensive theories, closing arguments, and even voir dire, if applicable. *Id*. at 355-56. We may also

consider whether the State emphasized the error. *Id*. at 356. Moreover, the improper admission of

evidence does not constitute reversible error if the same facts are proved by other properly admitted

evidence. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999).

We conclude that the admission of Hartin's testimony was harmless for reasons

including the following:

1. G.M. testified to the same facts that were the subject of her hearsay statements to Hartin. *See id*. (holding that any error in the admission of hearsay testimony was harmless in light of other properly admitted evidence proving same fact).

2. There were eight witnesses other than Hartin who testified to some extent about G.M.'s allegations. Although most did not testify as to what specifically G.M. told them, they did testify to certain facts from which a rational jury could infer Graham's guilt:

   - Officer Earle testified on cross-examination that G.M. had indicated to him that Graham had sexually assaulted her three times.

   - G.M.'s friend Natasha testified that G.M. had told her that Graham wanted to "lick her pussy" three nights in a row, and that on one occasion, Graham had "held her down."

   - G.M.'s mother Victoria testified that she had observed Graham looking at G.M. in the bathroom through a crack between the door frame and the door. Victoria also testified to an incident in which she woke up one night and saw Graham "bolt" from her daughter's side of their bedroom to the bathroom, and that Graham once complained about the "revealing clothes" that G.M. wore. Victoria further testified

that G.M. once told her that Graham "would wake her up during the night and ask if he could do certain things to her." When asked what specifically G.M. told her, Victoria replied, "That he wanted to lick her crotch and suck on her breasts."

- G.M.'s friend Rachel Martinez testified that G.M. told her something that "bothered" her and that she told G.M. that she needed to "talk to somebody about it." Rachel also testified about a statement in which she wrote that G.M. told her that "she was scared of her stepdad."

- Natasha's mother Yvonne testified that when G.M. told her that she "needed help," she decided to take her to the police department.

- Officer Goff testified that he interviewed G.M. and observed her interview at Roxanne's House. He testified that "what emerged from that interview" was "consistent with what G.M. had told [him] earlier."

- Sammye Sessions, a CPS supervisor for Hays and Caldwell Counties, also interviewed G.M. and observed her interview at Roxanne's House. She testified that G.M.'s statements during that interview were consistent with what G.M. had told her.

- Erin Tirrell, the forensic interviewer in this case, testified about her interview with G.M. and how G.M. used anatomical drawings to describe what had happened to her.

3.  Hartin was the second-to-last witness to testify for the State, and the hearsay statements Hartin testified to were merely cumulative of the testimony the jury had already heard:

- Hartin testified that G.M. told him that Graham had sexually assaulted her. G.M.'s friend Rachel and Officer Earle testified to the same facts.

- Hartin testified about the details of the sexual assault. G.M. testified to the same facts.

4.  The vast majority of Hartin's testimony was not hearsay. In fact, the State only asked Hartin two questions about the statements G.M. made to him, and his answers were less specific than the answers he provided to the court during the Rule 104 hearing outside the jury's presence:

11

Q: And without necessarily getting into too many specifics, what did she indicate was the nature of the abuse?

A: She told me that she had—she was in her bed. She awakened to find her stepfather—I think the way she put that was rub—rubbing—rubbing me down there, referring to touching her vagina. The—she talked about two other instances with me, and on both those occasions, the similarity where she was in her bed. She awakened, but then she found him licking me down there, is the way she put it.

Q: Okay. Did she point or indicate where she was talking about?

A: Referring to her vagina, and I asked her for clarification. There's no doubt that's what she meant.

That was the extent of Hartin's testimony about what G.M. told him about the abuse. The rest of Hartin's testimony related to other matters, such as G.M.'s mental abilities and the effects of the abuse.

5. The State did not mention Hartin in its opening statement and only briefly mentioned Hartin's testimony in its closing argument, which suggests that his testimony was not an integral part of the State's case.

After examining the record as a whole, we have fair assurance that the admission of Hartin's testimony concerning G.M.'s statements did not influence the jury or had but a slight effect. *See Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004). We overrule Graham's first issue.

**Opinion testimony**

In his second issue, Graham asserts that the district court erred in admitting Hartin's opinion testimony regarding the reason for G.M.'s delayed outcry. When Hartin offered his opinion on this matter, however, Graham did not object. To preserve error, the record must show that

12

appellant made a timely request, objection, or motion, and that the trial court ruled on it. Tex. R. App. P. 33.1(a)(1). Graham has not preserved error and, therefore, we overrule his second issue.

**Factual sufficiency**

In his third issue, Graham asserts that the evidence is factually insufficient to prove that his mouth contacted G.M.'s sexual organ on two separate occasions. Graham contends that G.M. testified that during the first incident Graham licked her breasts, but did not touch her vagina.

In a factual sufficiency review, we view the evidence in a neutral light and will set aside a verdict only if the supporting evidence is so weak that the verdict is clearly wrong or the contrary evidence is so strong that the jury could not have found all the elements of the crime beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). A verdict is clearly wrong and unjust if the "jury's finding is 'manifestly unjust,' 'shocks the conscience,' or 'clearly demonstrates bias.'" *Id*. (quoting *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997)). All the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). We consider all the evidence, rightly or wrongly admitted. *See Camarillo v. State*, 82 S.W.3d 529, 537 (Tex. App.—Austin 2002, no pet.) Although due deference must be accorded the fact-finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). The evidence will be deemed factually insufficient to sustain the conviction if the proof of guilt is too weak or the contrary evidence is too strong to

support a finding of guilt beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004); *see Johnson*, 23 S.W.3d at 11.

The indictment alleged that Graham sexually assaulted G.M. on two separate occasions "by causing the sexual organ of [G.M.] to touch the mouth of [Graham]." G.M. testified to three separate incidents involving Graham—two involving touching and a third involving only solicitation. Initially, G.M. testified that Graham did not touch her sexual organ during the first incident:

Q: Where was he touching you?

A: On my breasts.

. . . .

Q: Okay. And did he touch you anywhere else?

A: I don't think it was the first — I mean, I don't think so on the first time.

G.M. then testified that Graham touched her sexual organ during the second incident:

Q: And on that occasion, what happened?

A: He was licking my — I mean, he was licking my breasts and he was licking my crotch.

Q: Okay. Both places?

A: Yes.

Q: Was that same or different from the time before?

14

A:  It was different, I think.

Q:  Okay.

A:  Yeah.

Q:  Because now he's touching both places?

A:  Yes.

G.M. testified that there was a third incident when she awoke to find Graham in her bedroom telling her that she "turned him on and that he wanted to lick [her] crotch." However, G.M. testified that Graham did not touch her on this occasion.

Later on during her testimony, G.M. changed her story about what had happened during the first incident. In an effort to refresh her memory, the State referred to diagrams of the female body in which G.M. had, during the first trial, circled the areas in which Graham had touched her. These diagrams were admitted into evidence. The State inquired into G.M.'s markings on the diagrams:

Q:  How many circles are around the crotch?

A:  Two.

Q:  And are those circles different in some way on [State's Exhibit] 1A?

A:  Yes.

Q:  How are they different?

A:  There's a blue mark and a red — I mean, and a black.

15

Q: Okay.  Do you remember making those marks?

A: Yes.

. . . .

Q: And do you remember saying that he touched you on the crotch?

A: Yes.

Q: When you talked to me before, how many times did you say he touched you in your crotch?

A: Like this morning or —

Q: Well, yeah, this morning how many times did you say?

A: One or two.  I'm not sure.

Q: Okay.  How many did you tell me before?  Do you remember?

A: Two.

Q: Okay.  And were those at the same time or different times that he touched you in your crotch?

A: Different.

Q: Okay.  Are those the two times that we're talking about today?

A: Yes.

On cross-examination, Graham inquired into this apparent inconsistency in G.M.'s testimony:

16

Q: Okay. And the second thing I wanted to ask you is the first incident which occurred ... initially you told us that he didn't do anything with your crotch, correct?

A: Yes.

Q: Okay. Isn't it true that you've given prior testimony also that indicates that you testified that Mr. Graham licked your crotch twice on that particular occasion. Is that true?

A: Yes.

Q: That is true?

A: Yes.

Q: It happened twice on that one day?

A: Well, not on the same day.

Q: Okay. Well, I want to — do you recall testifying that — saying that you — he licked my crotch twice in prior testimony?

A: Well, that's for the first and second time.

. . . .

Q: Okay. So is it true that he licked your crotch twice on that one occasion?

A: Yes.

Q: That is true. But you didn't testify to that before, did you?

A: No.


The jury is the sole judge of the credibility of the witnesses and the weight to be given the evidence, and may choose to believe all, some, or none of it. *Margraves v. State*, 34 S.W.3d 912,

17

919 (Tex. Crim. App. 2000); *Rachal v. State*, 917 S.W.2d 799, 805 (Tex. Crim. App. 1996); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1991, pet. ref'd). Thus, the jury is permitted to believe or disbelieve any part of the testimony of any witness. *Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998). Reconciliation of evidentiary conflicts is solely a function of the trier of fact. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986); *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982); *Perez v. State*, 960 S.W.2d 84, 86 (Tex. App.—Austin 1997, no pet.) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). The jury could have accepted that portion of G.M.'s testimony sufficient to support the convictions and disregarded the inconsistencies. *See Perez*, 113 S.W.3d at 839. "A decision is not manifestly unjust because the jury resolved the manifestly conflicting views of the evidence in favor of the State." *Cain v. State*, 958 S.W.2d 404, 409 (Tex. Crim. App. 1997). Also, CPS supervisor Sammye Sessions provided testimony explaining why G.M.'s testimony might have been inconsistent, and the jury could have chosen to credit this testimony in reconciling the conflicts in the evidence.

The jury also heard testimony from Hartin that G.M. told him that Graham had touched her vagina on more than one occasion. However, even if this testimony had been excluded, as Graham contends it should have been, the testimony of a child victim alone is sufficient to support a conviction for sexual assault. *See* Tex. Code Crim. Proc. Ann. art. 38.07(b) (West Supp. 2003); *Perez*, 113 S.W.3d at 838. We also note that Graham did not testify, so the jury did not hear a contrary version of the alleged incidents.

Considering all the evidence in a neutral light, and giving due deference to the jury's

resolution of conflicts in the evidence, we do not believe the proof of guilt is too weak or the contrary evidence is too strong to support a finding of guilt beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484-85. We overrule Graham's third issue.

## CONCLUSION

Having overruled Graham's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: September 8, 2006

Do not publish

19