In The

# *Court of Appeals*

# *Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00406-CR**
**NO. 09-21-00407-CR**

_____

**JUSTIN LOUVIERE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

═══════════════════════════════════════

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause Nos. 19-31789 and 19-31791**

═══════════════════════════════════════

## MEMORANDUM OPINION

In trial cause number 19-31789, a grand jury indicted Justin Louviere ("Justin" or "Louviere") for continuous sexual abuse of a child, namely Bethany.[1]

In trial cause number 19-31791, a grand jury indicted Louviere for continuous sexual

---

[1] We use pseudonyms to refer to the alleged victims—minor children—and their family members other than Louviere. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

abuse of a child, namely Mary. Louviere pleaded "not guilty" to the charges and the two cases were consolidated and tried to a jury. In cause number 19-31789, the jury found Louviere guilty of the offense of sexual abuse of a child and assessed punishment at forty years in prison. In cause number 19-31791, the jury found Louviere not guilty of the offense of sexual abuse of a child but guilty of the lesser-included offense of indecency with a child, and the jury assessed punishment at twenty years in prison. The trial court accepted the verdicts and ordered the sentences to run concurrently. Raising three evidentiary issues, Louviere appeals.

Evidence at Trial

Bethany's Testimony

Ten-year-old Bethany testified that Louviere was her mother's little brother and Bethany had known him since she was one year old. Bethany testified that she and her stepsister Mary had the same father but different mothers. At trial, Bethany identified on a male doll what she referred to as a "front no-no" or a "thing" and indicated the doll's sexual organ.

According to Bethany, in the past Louviere would babysit her, and when she was six, he took her into her room, undressed, made Bethany undress, got on top of her on the bed, covered her face with a blanket or pillow so she could not see, and touched her "front no-no" with what she thought was his "front no-no," "because nothing else on him could have been that slimy and hairy" and his hands were on the

2

side of her at that time. Bethany testified Louviere's "front no-no" did not go inside, "just on" her "front no-no." Bethany testified that he flipped her over and did the same thing to her "back no-no." According to Bethany, when Louviere heard Bethany's parents drive in the driveway, he put his clothes on, told her to put her clothes on and to go to sleep or watch television, and told her to keep what had happened a secret. Bethany testified that she did not tell her parents when they got home because she was too scared, and she thought Louviere would hurt her parents.

Bethany testified that on another occasion, when her sister Mary was at Bethany's house, Louviere told Bethany to go into the bathroom with him, he closed and locked the door, he took off his pants and boxers, he made her sit on the counter, he tried to put "his thing" in her mouth, she kept her mouth closed and said "no," and she unlocked the door and ran out. Bethany testified that Mary had heard them in the bathroom and was confused, but Bethany did not tell her what happened and said, "it was just me running around."

Bethany recalled that on a different occasion, when she was about to turn seven, she and Louviere were watching a movie and she asked for a hot dog, Louviere put something in the microwave, got on top of her and told her to open her mouth, put a pillow over her face, but she pushed him off when she had it in her mouth and knew it was not a hot dog. According to Bethany, he then got her hot dog out of the microwave and gave it to her.

3

Bethany also testified that one time Louviere put a pillow on her face and told her to "grab on to this," and "he started going up and down[]" with "[h]is no-no, his thing[]" on her hand. According to Bethany, on a different occasion, Louviere put his "front no-no" in her "back no-no" when they were on her top bunk bed in her room, and he flipped her over so her face was in the pillow so she could not see. Bethany testified she "felt it go in" and he was moving for about five or six minutes until he heard Bethany's parents' car and he jumped up and got dressed and threatened Bethany if she told what had happened. Bethany testified that at her Aunt Kristen's house, she and Mary were swimming with Louviere, Louviere was behind Bethany, and Bethany could feel his "front no-no" going "in and out" of her "back no-no" but it was with bathing suits on and no skin contact. According to Bethany, at the time of the incident she was seven and her Aunt Kristen was twelve or thirteen. Bethany testified that at her Aunt Tammy's house, she and Louviere were playing hide and seek with her younger cousin, and while the cousin was counting, Louviere made her get undressed and he put his "no-no" in her "back no-no[,]" and then made her get dressed before the cousin found her. According to Bethany, "it happened two or one other time" at Aunt Tammy's house. Bethany testified when he was doing "it[,]" it would hurt, and he would make her moan while he did it. Bethany agreed that Louviere never "[went] inside of [her] front no-no" but did "go inside [her] back no-no."

4

Bethany testified that one day Mary told her that something similar had happened to Mary, and Bethany told Mary that "the same thing was going on with [her.]" Bethany testified that one time she climbed out of bed to get water and she saw Mary with her pants down and a pillow over her head, and Louviere was doing "pushups" on Mary like he would do to Bethany. Bethany testified that it "was all like scrambled like day after day after day" and "every time he would see us, he would try to do it every day." According to Bethany, it mostly happened during the summer, but it also happened during the school year. She testified it first started happening when she was six years old, and the last time was when she was seven years old. She testified that these instances happened over "[a]t least a month."

According to Bethany, on one occasion her mother Sherry and adoptive father Chad told Bethany and Mary that if anyone ever touched them to tell them, and Bethany and Mary told them what Louviere had done. Bethany testified that her mother cried, Chad was mad and said, "I'm going to beat him up[,]" and they took her to the hospital. Bethany testified that she initially felt like she was in trouble, but she also felt safer after she told Sherry and Chad because now "it was never going to happen again because they were there to protect me and they wouldn't let him come anywhere near me ever again." Bethany said she attended counseling from "Ms. Daisy" on Mondays and Wednesdays, and Bethany would talk about her feelings after what had happened and work on breathing and staying calm.

5

During cross-examination, Bethany testified that she and Mary did not talk about what they were going to tell the jury and that they told the prosecutor that they were going to tell the truth. She agreed she saw a part of the movie *Sausage Party* when she was young, but that her adoptive father turned it off when "a bad part was about to come on." She admitted that at home they listened to rap songs and certain songs her adoptive father listened to contained cuss words. She testified that her parents cussed only when they were mad. According to Bethany, it was Louviere, and not her Aunt Kristen, who would babysit Bethany and Mary.

<u>Mary's Testimony</u>

Nine-year-old Mary testified that she lived with her mother, Amanda, and her stepfather, and she stayed with her father (Chad), her stepmother (Sherry), and Bethany, on certain weekends. According to Mary, she last saw Louviere, Sherry's brother, when she was six years old but had not seen him since because he had done "bad things" to her and Bethany. Mary testified that she and Bethany told her dad and Sherry about those things because they "were scared that [Louviere] was going to do the bad thing."

Mary testified that she remembered Louviere putting his "private part" on her "private part" and that sometimes they did not have their clothes on when he did that to her. She testified what she referred to as "private parts" was where pee would come out of when she or Louviere used the bathroom. Mary testified that she did not

6

have separate names for her front "private part" and her back "private part" but sometimes she referred to her back private part as her butt. According to Mary, Louviere did this to her in the pool, at her Aunt Kristen's house, and then also in her room at her father's house, and that it maybe happened more than five times total. Mary testified that on one occasion when she and Bethany were swimming at the pool at Aunt Kristen's, Louviere put his private part on her butt and that his private was not in his swimsuit because she could feel his skin on her skin when he pulled down her swimsuit bottoms. She testified that it did not hurt, she did not see his private part come out of his swimsuit when it happened, and it happened quickly.

Mary testified that Louviere blindfolded her with something like a bandana when he did the "bad thing." Mary testified he put his "private part" on her "behind private part" and "wiggl[ed] around." She also testified that Louviere touched his private part to her private part "in front" where she would pee, but his private part never went inside of her front private part or back private part. According to Mary, sometimes she would cry while he did the "bad thing" to her and that it scared her because she did not know what was going on. Mary testified that Louviere did the "bad thing" when her dad and Sherry left the house and Louviere stayed with Mary and Bethany, and that Louviere stopped if Mary's dad and Sherry got home and pretended like they were all just watching television on the couch. Mary testified that Louviere "would either do [Mary] first or [Bethany] first, and then he let [them]

7

sit on the couch and play his phone." Mary testified that she did not tell per parents when it happened because Louviere threatened to kill or spank her and Bethany and that scared them. She did not remember when the last time it happened was but thought it was during the summertime.

Mary testified she saw Louviere do the "bad thing" one time to Bethany when Mary walked into the room and Bethany was lying face-down and he was on top of her facing down, and she remembered Bethany only having underwear on but could not remember if Louviere had clothes on.

On cross-examination, Mary testified that at her father's house she had heard music with cuss words and that she had heard her father and Sherry use bad language. Mary got in trouble after Bethany caught her playing a game with Bethany's younger cousin where they were playing dice and taking their clothes off, Bethany's father and mother were called, Sherry picked them up, and then Mary and Bethany told Chad and Sherry about what Louviere had done to them.

Bethany's Mother's Testimony

Sherry, Bethany's mother and Mary's stepmother, testified that Chad was not Bethany's biological father, but that Chad adopted Bethany and that he first met Bethany when she was about four years old because that was when Chad and Sherry first got together. Sherry testified that on July 13, 2018, when the girls were six years old, they made statements to her that they had been sexually abused by Louviere,

8

Sherry's younger brother. Sherry testified that Louviere and Sherry's sister, Kristen, sometimes lived at Sherry's house during 2017 and 2018, unless their father was off work. Sherry stated that, at the time Louviere lived with them, he was maybe a sophomore or junior in high school and Kristen was thirteen years old. Sherry testified that from Fall 2017 through Summer 2018 Louviere had access to the girls "[a]ny day really" because he was living with them and there was a gap between when Sherry would leave for work and Chad getting home. According to Sherry, Louviere and Kristen were paid to babysit the girls. Sherry testified that Mary stayed with Sherry and Chad "two to three, maybe more[,]" nights a week.

According to Sherry, on July 13, 2018, Bethany, Mary, and Sherry's son, Carson, had stayed the night at Tammy's house. Tammy told Sherry about an inappropriate game that Bethany caught Mary playing at Tammy's house, and Sherry picked up Bethany and Mary on the morning of July 14, 2018. When Sherry told Mary to tell her what happened and not to lie, Mary told Sherry that she and Wade had been in a back room playing a dice game that involved him licking or kissing her in an inappropriate spot. Based on the incident, Chad and Sherry decided that day to have the "good-touch, bad-touch" talk with Bethany and Mary. Sherry testified she discussed the sexual organs of a girl as "no-no areas" and told the girls that if anyone ever touched them inappropriately that they need to tell Sherry and Chad. According to Sherry, Mary then said that "uncle Justin . . . puts his no-no spot

9

on our no-no spot." Sherry testified that Bethany looked down with her hair covering her face, and Sherry said, "this is not something you can lie about [and] is very serious. Like, people will go to jail." Sherry testified that Mary told them that Louviere blindfolded them and that he sometimes put his no-no spot "on [her] face and calls it a baby bottle." According to Sherry, when she asked Bethany if this was true, Bethany said, "yes" and that Louviere "puts it on [Bethany's] face and calls it a hot dog." Sherry testified that from the conversation it was her impression from Mary's statement that Louviere "puts his no-no spot on my no-no spot[]" that the girls were saying that Louviere had intentionally put his sexual organ on their sexual organs. Sherry testified that she asked the girls why they had not told her before, and they said that Louviere told them that if they told they would get in trouble. Sherry testified that the girls reported that the incidents happened at Tammy's house and at Sherry's parents' house where Louviere lived sometimes, that it happened three different places, and that it happened multiple times at all three places. Sherry believed that Louviere most recently had access to the girls within days of their outcries.

According to Sherry, they took the girls to St. Elizabeth Hospital that day and the hospital called the police. The girls were separately examined by a Sexual Assault Nurse Examiner (SANE) and law enforcement arrived and took a statement. Sherry called Mary's mother, Amanda, to tell her, and Amanda went to the hospital.

10

The following Monday the girls were interviewed at the Garth House and continued receiving services from the Garth House. Sherry testified that to ensure the girls did not suffer from long-term effects of the abuse, Bethany received counseling from Daisy at the Garth House and Mary received counseling from Polly, who was not associated with the Garth House.

Sherry testified that the sexual abuse allegations affected her relationship with the Louviere side of her family, that her parents wished that Sherry had not called the police and chose not to be on the girls' side, and now her stepsister, cousin, and Paw-Paw were the only family members who talked to her. According to Sherry, the girls had been affected, and they did not really go anywhere or were allowed to do anything. Sherry testified that Bethany had gained weight and had nightmares, and both girls were scared of the dark. Sherry testified that, in hindsight, there were two instances prior to the outcries that she felt if she had questioned Bethany further, she might have learned about the abuse sooner. On one occasion, she had picked Bethany up from Sherry's mom's house where Bethany had been staying sometimes during the week and when Sherry was getting Bethany out of her clothes, she noticed Bethany's underwear was inside out and commented, "Silly girl, [] your clothes [are] on wrong." According to Sherry, Bethany replied, "Well, Uncle Justin did that[,]" but Sherry testified that she "chalked it up that he was helping get [Bethany] dressed in the morning." On another occasion, Sherry left for work but realized after about

11

ten minutes that she had forgotten something, and when she drove back to the house, she heard someone running through the house, and when she opened the sliding glass door, Louviere was shirtless and jumped over the back of the couch onto the couch and said, "Oh, [Bethany] is in her room doing something." Sherry thought nothing of it and got whatever it was she forgot and left.

Sherry testified that her sister Kristen was almost always with the girls when Louviere was there. As far as she knew, the girls had never seen *Sausage Party* at her house, but she agreed that she and Chad use "bad words" in the girls' presence.

Mary's Father's and Bethany's Adoptive Father's Testimony

Chad, Mary's father and Bethany's adoptive father, testified that Bethany spent a lot of time with Louviere because she went over to Louviere's parents' frequently, Louviere was often at Chad and Sherry's house, and Louviere was around Mary when she stayed with them every other weekend and on Thursdays. According to Chad, Louviere babysat the girls sometimes by himself and sometimes with Louviere's sister, Kristen.

Chad testified that after they found out Bethany caught Mary naked with her cousin playing a game, Chad and Sherry talked to Bethany and Mary about inappropriate touching. Chad testified that Mary said, "well, Uncle Justin[,]" and Chad said, "Uncle Justin what?" Chad testified that Mary answered, "Uncle Justin tried to put his no-no part in my no-no part." Chad testified he was devastated and

12

did not really remember what they talked about next, but he remembered taking the girls to the hospital and telling Amanda, Mary's mother. Chad testified that the girls gave individual interviews at the Garth House. Bethany went through months of counseling, which Chad believed helped Bethany cope with what she had experienced.

According to Chad, he did not remember Bethany or Mary ever seeing the movie *Sausage Party* or any kind of pornography, and he would have turned it off if he caught them watching anything not appropriate. Chad denied that the girls had ever caught him having sex, that Tammy ever walked in on him having sex, or that he ever asked his wife about anal sex in front of the children. Chad admitted that Bethany and Mary were exposed at their house to rap songs that contained explicit sexual language. Chad testified that he "picked up a drinking problem[]" after "everything went down" and he checked himself into treatment for a week. Chad testified he had also considered counseling later when he was in rehab because he felt like he failed the girls for not only failing to protect them but also for paying Louviere for babysitting and buying him things while he was hurting the girls.

Mary's Mother's Testimony

Amanda, Mary's mother, testified she never questioned Mary being around Louviere or him babysitting her because he was Bethany's uncle. Amanda testified that on July 14, 2018, while Mary stayed at Chad's for the month under their custody

13

arrangement, Sherry called Amanda crying and told her she was sorry and told her what had happened. According to Amanda, she became very upset, and she and her husband went to the hospital to see the girls.

Amanda testified she brought Mary to the Garth House for an interview and the Garth House referred Mary to a counselor, Polly. According to Amanda, Mary completed counseling, did well with it, and felt comfortable with Polly. Amanda testified that Mary has expressed fear about seeing Louviere.

Amanda testified Mary lied about little things like "every kid does," but that Amanda had never had issues with Mary or her behavior. She acknowledged that on one occasion Mary got in trouble with Wade, Tammy's son, and Mary was caught with her pants down.

Testimony of Kim Hanks

Kim Hanks, a forensic interviewer supervisor at the Garth House, testified that although she was not the interviewer for Bethany's and Mary's interviews, she reviewed the recorded interviews. Hanks testified as to the process of the interviews and that the interviewer in this case conducted the interviews in accordance with standard practices. According to Hanks, both Bethany and Mary cooperated during their interviews.

<u>Testimony of Detective Charles Duchamp</u>

Detective Charles Duchamp with the Beaumont Police Department Special Crimes Unit testified that he observed Bethany's and Mary's interviews at the Garth House via closed-circuit TV in another room. According to Detective Duchamp, the details Bethany and Mary gave during their interviews alarmed him. After the interviews, Detective Duchamp took statements from the girls' parents. Duchamp testified that two other children, Kristen and Wade, were interviewed related to the case but "[t]here was nothing further for us to move on with those interviews."

Detective Duchamp testified he reached out to Louviere to see if he wanted to give a voluntary statement, and Louviere and his father were interviewed by Duchamp. Neither made any admissions to Detective Duchamp regarding the case. According to Duchamp, he did not expect that the girls' SANE exams would reveal anything because the exams were outside of 120 hours of the alleged abuse and there is not always injury when sexual abuse occurs. Detective Duchamp testified that he was not able to identify any motive that the girls or any of the adults involved had to make up the allegations in this case and that he knew of no one in the case with a greater motive to lie than Louviere.

Detective Duchamp testified he had seen the movie *Sausage Party* and it is a cartoon about food in a grocery store, contains sexual inuendo, and is not appropriate for children to watch.

Testimony of Daisy Reyna

Daisy Reyna, a licensed professional counselor with a bachelor's degree in family studies and a master's degree in clinical and mental health counseling, testified that clients were referred to her for counseling after a forensic interview or were referred by law enforcement. According to Reyna, all the children referred to her had experienced some type of trauma, and most of the children she saw were victims of sexual abuse. Reyna testified that she used the DSM, which psychiatrists used to diagnose mental health disorders, to help her clients.

Reyna testified that Bethany started seeing her for counseling for sexual abuse when Bethany was six years old and continued to see Reyna for about two years. She saw Bethany for counseling forty-seven times from August 8, 2018 to June 27, 2019. According to Reyna, she used Trauma Focused Cognitive Behavioral Therapy with Bethany, which is a recognized method of treatment in the counseling field and focuses on a client's thoughts, feelings, and actions. Reyna testified that she used that type of therapy to help clients learn about trauma responses, how to regulate their moods, and relaxation skills.

According to Reyna, based on her education and training, she believed she was a mental health professional, and she assessed children's mental health to determine treatment plans such as the child's presenting problems, a diagnosis based on the DSM, goals for counseling, and type of counseling needed. Reyna testified

16

that she assessed and created a treatment plan for Bethany. She testified that at Bethany's first session it was an important part of Reyna's treatment of Bethany to understand from Bethany's perspective why she was there to see Reyna, and that Reyna would not have been as effective without knowing from Bethany's own viewpoint why she was there. According to Reyna, Bethany said she was there to see Reyna because "Uncle Justin did no-no things." Reyna testified that it was important that Bethany identified her abuser because it was important for counseling and that counseling could be different if the child was abused by a stranger as opposed to a family member or close friend. Reyna testified that if the abuser was a trusted person or a family member the abuse could affect the child more because of the relationship and trust involved and whether family and extended family believed the child regarding the abuse. Reyna testified that she helped Bethany with relaxation technique, and Reyna educated her about "grooming" and trauma responses. Reyna testified that she would not have seen Bethany if she did not experience any signs of trauma. According to Reyna, Bethany completed the therapy components, but if she needed to come back to counseling, Bethany would be welcome to come back to Reyna for further counseling.

On cross-examination, Reyna agreed that at the time she was counseling Bethany, Reyna was an intern and was being supervised.

17

Testimony of Rachel Thomas

Rachel Thomas, a forensic nurse at Christus St. Elizabeth Hospital and Sexual Assault Nurse Examiner (SANE), testified that she performed sexual assault exams on Bethany and Mary on July 14, 2018. Thomas's reports for the exams were admitted into evidence over the defense's objection and published to the jury. Thomas testified that when a pediatric patient presented to the hospital on sexual abuse, the child was placed in a private room, and Thomas met with the parents and child at the same time to introduce herself, provided them with the resources from the Texas Department of Health and Human Services, explained the exam, and explained and obtained parental consent. Thomas testified that she took the child to a private exam room and explained that she was there to take care of them, gave a tour of the exam room, and obtained information from the child prior to the exam. According to Thomas, the purpose of obtaining information from the child regarding what brought them to the hospital was "for medical diagnosis and treatment[,]" and so she had "an idea as to why they [we]re there so that [she knew] how [she could] take care of them."

Thomas testified that after she obtained a history from the patient, she collected specimens to be sent to the crime lab (if the contact happened within the last 120 hours) and then began the genital exam to look for injury, cuts, bruises, scars, signs of infection, redness, discharge, or odor. Thomas testified that if it was

18

a young female patient, she explained to the patient that she was using a camera to determine if there were any injuries or infections that need to be treated.

Thomas testified that she noted in her report as to what six-year-old Mary reported to Thomas as part of her patient history:

Patient states Uncle Justin made us do some bad stuff that grownups do. He made me feel it in the pool right here, the boy's no-no spot. Sometimes he blindfolds us, me and [Bethany], and then he made us - - sometimes he tells us I'm going to tell your parents that you're not listening to me. He pulls our panties down. Then he puts his no-no spot in there. He says quit, shh, quit talking. When Daddy or [Sherry] are back, he says pull your panties back up. He puts it between and goes there - - and she pointed to the back of her legs under her buttocks and then moves her hand around to the front of her legs next to her vulva. . . . Then he runs in the room and acts like he's watching TV. It started when I was like 5. In the pool, he makes us feel it.

Her report noted that "During genital exam, patient point to labia minora and states he put it here and she points to that area." Thomas testified that she determined that the last contact between "Uncle Justin" and Mary was Father's Day, which was in June and outside of 120 hours of the exam, so no evidence was collected for the crime lab. According to Thomas, the genital exam performed on Mary did not reveal any physical symptoms or any injuries to the labia majora or minora, but that did not mean the reported abuse did not occur. Thomas testified that Mary told her a sexual assault occurred, and that no injury was "very consistent" with sexual assault and it was "very normal[]" for there to be no injuries detected during an exam after a sexual assault.

Thomas testified that she noted in her report as to what six-year-old Bethany reported to Thomas as part of her patient history, and the report included the details of what Bethany reported to Thomas.

> Patient states because no-no stuff, my Uncle Justin has been sexing me and my sister, [Mary]. He been doing it night, day, in the pool, even in front of my cousin, not cousin. She's my Aunt [Kristen]. We was in the pool. So, she couldn't see. He made us get facedown. We was blindfolded. Sometimes he put a blanket over our faces. He pulled down his pants. He got on top of us; and he went up and down, up and down. His no-no spot was right to my no-no spot. Then we flipped over; and he did the same thing, blindfold, blanket or whatever. He did the same thing. He put his no-no spot - - and she pointed to her vulva, which is the outside of her sexual organ - - in my no-no spot and went up and down.
> …
> He made us go in our aunt's tree house. He got spray and closed the door, wasp spray. He put a piece of wood over the door. He had like three bottles of spray. He made me hide behind a curtain and he sprayed the wasp spray everywhere, even on the windows. I was behind the curtain. He had a mask on and said I know I have a girlfriend but I got to do it because . . . she's not here. He had to do the no-no spot. He put it in my back no-no spot and make me say oh, oh. I started crying again. It didn't feel good. Then he made me touch his no-no spot. He made me go up and down and she made her hand into a C-shape and moves hand up and down. Then it was kind of slobbery. I had to wash my hands. It was like pee spit. Then he put it in my mouth again and made me put my legs around him in the pool again and made me move my body like this and she thrusts her hip back and forth. He's like 18.

She determined that Bethany's last contact with Louviere was Father's Day, so no evidence was collected for the crime lab for the same reason no evidence was collected from Mary. Her report noted that the exam indicated generalized genital redness and that during the genital exam Bethany reported that "patient states he put

20

his no-no spot in the cracks." Thomas testified that no injuries were documented for Bethany's exam.

Additional documentation regarding the exam of each child was also admitted into evidence by the defense. Thomas testified that those forms are used to communicate with physicians that oversee them and include "an overview of what we've seen, what our patients have given us in their histories. This is where we talk to our physician about is there any more testing we need to do, are there any more concerns, if they were going to do x-rays."

Louviere's Testimony

Twenty-one-year-old Justin Louviere testified he never did anything to hurt Bethany or Mary, and he never did anything sexual to either girl. At the time of the allegations, he was over the age of seventeen and lived at his parents' house in Sour Lake. According to Louviere, his little sister, Kristen, babysat Bethany and Mary, but after a shooting happened at the trailer park where the girls were staying, his father requested that Louviere go over with his little sister when she babysat the girls because Louviere's father was not comfortable having his youngest daughter there alone. Louviere denied being Bethany's and Mary's "main babysitter" and could not recall any time he babysat Bethany or Mary by himself. Louviere acknowledged that Sherry and Chad paid him, but Louviere testified that he was paid to be there with

Kristen and to cook. Louviere also admitted to having to give Bethany or Mary a spanking every now and then when they were acting up.

He testified he had a good relationship with the girls, and he had no idea why they would make these allegations against him. He acknowledged that something may have happened to them but that he was not the person that did it to them.

Louviere testified that Bethany and Mary played in the pool at his parents' house, and that when he swam and played games with them there would be someone else—his sisters Kristen or Brenda, or his nephews, or his mother and father— swimming, too. He denied sexually touching Bethany or Mary in the swimming pool.

Louviere testified that at times he and Kristen would spend the night with Bethany and Mary either at Sherry and Chad's or at Louviere's parents' house. According to Louviere, when he spent the night at Sherry and Chad's he slept on the couch in the living room, and Bethany and Mary slept in their room. Louviere testified he never snuck into the girls' room for any reason. He testified that, on one occasion, Bethany walked into the restroom while he was using the restroom, he yelled at her and told her mother, and he was "pretty sure she got in trouble with her mom[.]"

Louviere testified that his dad built a tree house for Kristen at Louviere's parents' house, that he sprayed it for wasps and made sure snakes were not inside,

but he never took Bethany or Mary in it. According to Louviere, he never spent the night at his brother and sister-in-law's when they babysat Bethany and Mary. Louviere testified that he always made sure he was not alone with anyone's children because he was not comfortable so he "always ha[d] someone around."

According to Louviere, he was shocked when he heard the girls' accusations against him. He testified that a detective called Louviere's father and asked if he and Louviere could talk to them, so Louviere and his father went and voluntarily answered the detective's questions. Louviere testified that he had no idea why Bethany and Mary accused him. He testified that when Bethany and Mary made the allegations against him, Chad threatened to kill him. Louviere testified that his parents tried to get the family together to talk about the allegations, but Sherry and Chad refused. Louviere testified that everyone on the "Louviere side" of his family supported him and talked to him but he had not talked to Sherry.

Testimony of Louviere's Sister, Brenda

Brenda, Louviere's sister, testified that she has two sons, Wade and Brian. She was at Tammy's house the day that they found out Wade and Mary played the dice game that involved them taking their clothes off and Mary making inappropriate sexual comments. According to Brenda, Kristen babysat Bethany and Mary, and although Louviere was there, it was Kristen who babysat the girls. Brenda testified that Louviere played with the girls but "there was always somebody with him

23

because he's very shy when it comes to children[.]" According to Brenda, Bethany and Mary loved being around Justin and she never saw them avoid him. She testified that Chad got intoxicated daily and made sexual comments. Brenda testified that Mary and Bethany were known to lie for each other, and they cussed. Brenda did not believe that the girls lied about what had happened to them, but she believed they lied about who did it, although Brenda agreed she did not know who did it. She agreed that nothing could convince her that Louviere did what Bethany and Mary said he did to them.

Testimony of Louviere's Sister, Kristen

Kristen, Louviere's sister, testified that when she was thirteen, she babysat Bethany and Mary and they made the allegations against Louviere. She testified that she babysat Bethany and Mary often and that Louviere was not the "main baby-sitter" and was only there after there was a shooting around Sherry's house and Louviere and Kristen's parents did not feel comfortable with Kristen going to babysit by herself there.

According to Kristen, when she babysat at Sherry's house, Louviere was outside or on the couch and never took any of the girls off alone or to the bathroom. Kristen testified that Louviere let her know that he did not want to be around them by himself and "[h]e had so much anxiety being alone because he was scared something would happen to them, get hurt or something like that." She testified she

24

never left Justin alone with Bethany or Mary. On cross-examination, Kristen conceded that "[m]ost of the time[]" she had her eyes on the girls when Justin was there but agreed she did not have her eyes on the girls "24/7 when Justin was around."

Kristen testified that Mary and Bethany came over to Kristen and Louviere's parents' house maybe once a month and Louviere usually was not there, but if he was, he was outside working on his trucks or on the couch watching movies. According to Kristen, there were times when she and Louviere were in the pool there with Bethany and Mary, and that the pool was small, the water was clear and not deep, and it would have been impossible for Louviere to be off on one side of the pool doing something inappropriate with one of the children.

Kristen testified that Bethany and Mary loved Louviere and would run up to him and give him a hug any time they would see him. According to Kristen, he would not go off with the girls alone and play games without her being present and it was not possible that he went into the girls' room without Kristen knowing it. Kristen testified that she had been to Tammy's house also when Louviere, Bethany, and Mary were there, but that Tammy was always there, and Louviere was never alone with the girls there.

Kristen testified that Chad was abusive, very vulgar, she had witnessed him have a drinking problem, but had not heard him say inappropriate things around the

25

children. Kristen testified that on one occasion at Chad and Sherry's prior residence, Kristen and her parents walked in and Chad, Bethany, and Mary were watching the movie *Sausage Party*, and Kristen's father confronted Chad about the movie. According to Kristen, Bethany and Mary lied about little things all the time. She witnessed Bethany and Mary listening to rap music containing cuss words and she heard Bethany and Mary cuss.

Testimony of Louviere's Sister-In-Law, Tammy

Tammy testified that she was married to Louviere's brother. According to Tammy, throughout the years she babysat Bethany and Mary at her house, and she was around them pretty frequently. Tammy testified that she had never seen Louviere do anything to either Bethany or Mary, and when Bethany or Mary had been around Louviere, some other family member was always present. Tammy testified that Louviere was never babysitting Bethany or Mary and that the girls' usual babysitter was either Tammy or Kristen, who was thirteen or fourteen at the time of the allegations. Tammy testified that Bethany and Mary loved Louviere, they were always excited when he came over, there were "no red flags[,]" and they never acted like they were afraid of him.

Tammy described Chad as "very vulgar" and "very scary at times." She testified he had a drinking problem, and on one occasion, she was embarrassed when he and Sherry knew Tammy was coming over, and she walked in on them having

26

sex on the couch while their children were in their rooms because Sherry thought it would be funny for Tammy to walk in on them. According to Tammy, Chad talked about anal sex in front of the children and allowed them to listen and dance to rap music with cuss words. A short video Tammy recorded of Bethany and Mary dancing to rap music with the lyrics "sexing me" at Sherry and Chad's house was admitted into evidence and published to the jury. Tammy testified that Bethany and Mary were always "trying to get out of trouble, trying to cover up what they did, lying for one or the other so they both wouldn't get in trouble."

Tammy testified that on July 13, 2018, Brenda was at her house, along with all the cousins—Bethany, Mary, Carson, Wade, and Brian—who were playing together. When she learned that Wade and Mary were playing a dice game where if a certain thing was rolled, Wade had "to lick her down there[,]" she called Sherry to tell her. According to Tammy, Chad arrived at Tammy's house intoxicated around 10 p.m., picked up Carson, but left Bethany and Mary to spend the night. Sherry picked Bethany and Mary up the next morning. Tammy testified that she learned about the allegations against Louviere when her sister-in-law, Brenda, called her the following evening and told her to come over to Tammy's mother-in-law and father-in-law's house where Brenda told her what Sherry had told her.

On cross-examination, Tammy testified that one of the occasions in which she testified Louviere was not alone with the girls was when Tammy had gone to work

27

for eight hours and Brenda was at the house with Louviere, and the girls and Tammy did not actually see Brenda for eight hours, so she did not know if Brenda was there with Louviere the entire time. Tammy acknowledged that she "took [Louviere's] side" regarding the allegations.

## Standard of Review

Louviere's three appellate issues challenge the trial court's admission or exclusion of evidence. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016). Under this standard, we may reverse the trial court only if its decision lies outside the zone of reasonable disagreement. *Id*. at 83. An abuse of discretion does not occur unless the trial court acts "'arbitrarily or unreasonably'" or "'without reference to any guiding rules and principles.'" *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (citations omitted).

## Testimony of SANE Nurse and Mental Health Counselor

In issue one, Louviere argues that the trial court erred by allowing the SANE to testify as to statements made by Bethany and Mary. In issue two, Louviere argues that the trial court erred by allowing Reyna, a mental health counselor, to testify to hearsay statements made by Bethany and Mary.

Hearsay is an out of court statement that a party offers to prove the truth of the matter asserted within the statement. Tex. R. Evid. 801(d). Hearsay is not

28

admissible except as provided by statute, the rules of evidence, or by other rules prescribed under statutory authority. Tex. R. Evid. 802. Once the opponent of hearsay evidence makes the proper objection, it becomes the burden of the proponent to the evidence to establish that an exception applies that would make the evidence admissible in spite of its hearsay character. *Taylor v. State*, 268 S.W.3d 571, 578-79 (Tex. Crim. App. 2008). There are numerous exceptions to hearsay, including an exception for a statement made for, and is reasonably pertinent to, medical diagnosis or treatment and describes medical history, past or present symptoms or sensations, or their inception and their general cause. Tex. R. Evid. 803(4). This exception is based on the assumption that the patient understands the importance of being truthful with the medical personnel involved to receive an accurate diagnosis or treatment. *See Puderbaugh v. State*, 31 S.W.3d 683, 685 (Tex. App.—Beaumont 2000, pet. ref'd); *Franklin v. State*, 459 S.W.3d 670, 676 (Tex. App.—Texarkana 2015, pet. ref'd); *Beheler v. State*, 3 S.W.3d 182, 188 (Tex. App.—Fort Worth 1999, pet. ref'd). For statements to be admissible under Rule 803(4), the proponent of the evidence must show that: (1) the declarant was aware that the statements were made for the purposes of medical diagnosis or treatment and that proper diagnosis or treatment depended on the veracity of the statement; and (2) the particular statement offered is also "pertinent to treatment"; that is, it was reasonable for the healthcare provider to rely on the particular information in treating the declarant. *See Taylor*, 268 S.W.3d

at 589, 591; *Hanke v. State*, No. 09-14-00326-CR, 2015 Tex. App. LEXIS 9884, at *18 (Tex. App.—Beaumont Sept. 23, 2015, no pet.) (mem. op., not designated for publication) (citing *Taylor*, 268 S.W.3d at 588-91; *Mbugua v. State*, 312 S.W.3d 657, 670-71 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd)); *Prieto v. State*, 337 S.W.3d 918, 921 (Tex. App.—Amarillo 2011, pet. ref'd).

In issue one, Louviere argues that the hearsay exception under Texas Rule of Evidence 803(4) did not apply to the statements made to the SANE because the statements were not for medical diagnosis and there was no indication based on the testimony of the parties that the child understood the importance of being truthful. Here, the SANE testified about her procedure when conducting SANE exams of children, and she explained that she introduces herself and tells the children she will be talking with them to obtain information from patients. She testified she took a history of what happened to Bethany and Mary and performed their genital examinations. Thomas testified that the girls realized that they were in a hospital and that they were speaking to a nurse "to be taken care of." Thomas testified that the purpose of obtaining information from the child regarding what brings them to the hospital is "for medical diagnosis and treatment[,]" and so Thomas has "an idea as to why they are there so that I know how I can take care of them." Thomas also testified as to the forms related to the girls' exams that were admitted into evidence and explained that those forms were used to communicate with physicians that

oversee them and include "an overview of what we've seen, what our patients have given us in their histories. This is where we talk to our physician about is there any more testing we need to do, are there any more concerns, if they were going to do x-rays."

In addition to the SANE's testimony connecting Bethany's and Mary's statements to medical treatment and diagnosis, Texas Rule of Evidence 803(4), the exception to the rule against hearsay for statements made for medical diagnosis or treatment, explicitly includes statements of the inception or general cause of the symptoms and sensations, insofar as they are reasonably pertinent to diagnosis or treatment. Tex. R. Evid. 803(4). The identity of an offender falls within the ambit of the hearsay exception governing statements made for medical diagnosis or treatment because it is relevant to treatment, particularly with incest and family violence cases, insofar as it presents an environmental and safety issue that could frustrate diagnosis and treatment. *See Taylor*, 268 S.W.3d at 591; *Gutierrez v. State*, 630 S.W.3d 270, 280 (Tex. App.—Eastland 2020, pet. ref'd). "[B]ecause the treatment of child abuse victims includes removing the child from the abusive setting, the identity of the abuser is pertinent to the medical treatment of the child." *Garzoria v. State*, No. 09-17-00019-CR, 2018 Tex. App. LEXIS 7023, at *6 (Tex. App.—Beaumont Aug. 29, 2018, pet. ref'd) (mem. op., not designated for publication) (citing *Fleming v. State*, 819 S.W.2d 237, 247 (Tex. App.—Austin 1991, pet. ref'd)). So, a medical

31

professional's testimony regarding a victim's statement describing the assault and identifying a defendant as the offender in a sexual assault case is admissible under rule 803(4) because the cause of the injuries and the identity of the perpetrator are reasonably pertinent to medical diagnosis or treatment. *See Guzman v. State*, 253 S.W.3d 306, 308-09 (Tex. App.—Waco 2008, no pet.).

We look to the entire record to determine whether a child understands the importance of being truthful when being questioned by medical personnel. *Calvert v. State*, No. AP-77,063, 2019 Tex. Crim. App. Unpub. LEXIS 584, at *116 (Tex. Crim. App. Oct. 9, 2019) (not designated for publication) (citing *Franklin*, 459 S.W.3d at 676-77); *Beheler*, 3 S.W.3d at 188. Rather as the Texas Court of Criminal Appeals has stated, "[I]t seems only natural to presume that adults, and even children of a sufficient age or apparent maturity, will have an implicit awareness that the [medical personnel]'s questions are designed to elicit accurate information and that veracity will serve their best interest." *Taylor*, 268 S.W.3d at 589. Also, it is reasonable to assume that a child of sufficient age understands that statements made to a recognized medical professional, such as a physician or nurse, are "made for the purpose of medical diagnosis and treatment." *Gohring v. State*, 967 S.W.2d 459, 463 (Tex. App.—Beaumont 1998, no pet.). The SANE does not have to expressly state that the victim recognized the need to be truthful in their statements for the medical treatment exception to apply. *See Wright v. State*, 154 S.W.3d 235, 241 (Tex. App.—

32

Texarkana 2005, pet. ref'd). "[C]ourts can infer from the record that the victim knew it was important to tell a SANE the truth in order to obtain medical treatment or diagnosis." *Franklin*, 459 S.W.3d at 677 (citing *Prieto*, 337 S.W.3d at 921).

The record is sufficient to support an inference that Bethany and Mary understood the necessity to be truthful for the purpose of medical diagnosis or treatment. *See Fahrni v. State*, 473 S.W.3d 486, 497-98 (Tex. App.—Texarkana 2015, pet. ref'd) (citing *Taylor*, 268 S.W.3d at 589)); *see also Gohring*, 967 S.W.2d at 463 (ordinarily it is reasonable to assume that a child will understand that a statement given to a "recognizable health professional, such as a physician, nurse, psychologist, or mental health therapist[]" will be for purpose of medical diagnosis or treatment); *Beheler*, 3 S.W.3d at 188 ("there is no requirement that a witness expressly state that the hearsay declarant recognized the need to be truthful in her statements for the medical treatment exception to apply[,]" even if that declarant is a child). We conclude that the trial court did not abuse its discretion in admitting the SANE's testimony relating to Bethany's and Mary's statements identifying Louviere as the person who sexually assaulted them and describing the assaults. *See* Tex. R. Evid. 803(4).

In issue two, Louviere argues that the testimony of Reyna, the licensed professional counselor that counseled Bethany, should not have been allowed under Texas Rule of Evidence 803(4) because that exception to the hearsay rule is based

on the assumption that the patient appreciates that the effectiveness of the treatment may depend on the accuracy of the information provided to the physician, and here, Reyna testified that she would not have the personal knowledge of the accuracy of the statements made by the child and there was no way to assume the reliability of what the child was saying.

The Texas Court of Criminal Appeals has held that in the context of a child-victim's statement to a therapist or counselor, as opposed to a physician, "it is incumbent upon the proponent of the hearsay exception to make the record reflect both 1) that truth-telling was a vital component of the particular course of therapy or treatment involved, and 2) that it is readily apparent that the child-declarant was aware that this was the case." *Taylor*, 268 S.W.3d at 590. "Otherwise, the justification for admitting the out-of-court statement over a valid hearsay objection is simply too tenuous." *Id.*

Prior to Reyna testifying before the jury, the trial court requested background for Reyna's testimony so the trial court could determine whether Reyna's testimony was admissible. Reyna testified that as a licensed professional counselor she is a nonmedical professional and she does not take her information to a medical doctor for purposes of a diagnosis or treatment. Reyna testified that knowing the identity of the perpetrator was necessary and pertinent to her treatment of the child but that she had no personal knowledge of the accuracy of the statements made by the child. She

34

testified that she tells the children she counsels "just be honest with me" and she tells them if they did not know something to not make anything up. Louviere objected to Reyna's testimony on the ground that the State had not shown that the child knew the difference between the truth or lies or whether the child was asked leading questions, and that telling the child to tell the truth is not enough.[2] The trial court overruled Louviere's objection to Reyna's testimony but excluded Reyna's records because they "seem to bolster and repeat what her testimony would be[.]"

On this record, the State met its burden to show that truth-telling was a vital component of the particular course of therapy or treatment provided by Reyna and that it was readily apparent that Bethany was aware that this was the case. *See id.* Furthermore, even if the trial court erred in admitting Reyna's testimony, we conclude there would be no harm from the admission of this testimony. The record reflects that prior to Reyna's testimony, Bethany already testified that Louviere had sexually abused her and testified as to the abuse. The SANE also testified as to Bethany's reports of how Louviere sexually abused her, and the SANE's report documented Bethany's allegations against Louviere. Bethany's mother, Sherry, also testified as to the details of Bethany's outcry of sexual abuse by Louviere. Any error

---

[2] Louviere also objected on the grounds that Reyna is not a medical professional and that Reyna's testimony about how she helped Bethany handle her alleged trauma is not relevant to whether or not Louviere is guilty, but Louviere does not argue these points on appeal.

35

in admission of evidence is harmless and does not constitute reversible error when substantially similar evidence is introduced at trial through other witnesses. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (concluding that any error in admitting hearsay evidence was harmless in light of other properly admitted evidence proving the same fact); *Bargas v. State*, 252 S.W.3d 876, 897 (Tex. App.— Houston [14th Dist.] 2008, pet. ref'd). Accordingly, we cannot conclude from the record as a whole that the error, if any, influenced the jury. *See* Tex. R. App. P. 44.2(b); *Motilla v. State*, 78 S.W.3d 352, 358, 360 (Tex. Crim. App. 2002); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). We overrule issue two.

Exclusion of Facebook Exhibits

In issue three, Louviere argues the trial court erred by excluding "Facebook exhibits" Louviere offered into evidence at trial to support the defense's theory that Bethany and Mary were exposed to a sexual environment by Chad and Sherry. In a hearing outside the jury, Louviere offered into evidence a Facebook posting by Chad in a private Facebook group. During the hearing, Chad agreed that the picture portrayed Sherry appearing to be performing oral sex on Chad while Chad was wearing a Stormtrooper's mask on his face. The exhibit was admitted as Defense Exhibit 1 for the purposes of the hearing only. During the hearing, Chad was questioned about the Facebook post and asked if he believed Bethany and Mary were raised in a sexual environment. Chad testified that "[a]nything that happened like

36

that was behind closed doors[,]" and the girls had "never been around or exposed to that kind of stuff except for what Justin did." Chad testified that the girls were not present when the photograph was taken, the Facebook page was a private page, and the girls still did not have access to Facebook. The following exchange occurred at the hearing:

> [Defense counsel]: Your Honor, one of the defensive theories on this case, Your Honor, is that the children were brought up in a sexual environment and I think we've already tied in the relevance to like one of the children saying "sexing me" to the SANE nurse and, you know, in that type of environment.
>
> In order for the jury to have the whole picture, I think that it is relevant for the jury to know and hear evidence of sexual statements and acts that may have affected the child, you know, prior to these allegations. In the case of *Montgomery vs. State* cited at 810 S.W. 2d 372 - -
>
> . . . .
>
> We are contending that that case, one of the things that that case stands for is that evidence is relevant that has a tendency to make the existence of that fact more probable and the State's theory even less probable.
>
> The *Montgomery* case specifically says that evidence that serves to make more or less probable a defensive evidence that undermines an element of fact is, in fact, relevant to these types of proceedings. . . .
>
> . . . .
>
> [Prosecutor]: The State's response is several parts, I guess. Nothing about Defense Exhibit 1 indicates that the children were present for that photo or walked in on that photo. That photo appears to be taken in a bathroom. There has been no testimony elicited from either of the children that they have ever seen their parents engaging in anything like that. There has been no testimony elicited from the parents indicating that the children have ever caught them in any sort of act, certainly, not the specific one in that photo. There has not been evidence of the children saying "sexing me."

37

There has not been evidence of the children, other than [Bethany], indicating that she watched partially the *Sausage Party* movie, which has been alluded to as being inappropriate for children. There has been nothing specifically pointed to that movie saying that it includes sexual acts that children ought not to know about, and that movie is separate and apart from any private Facebook group that the children did not have access to.

. . . .

THE COURT: All right. In support of his argument, [defense counsel] has tendered *Montgomery vs. State*. *Montgomery vs. State*, as many of us well know, is on dealing with probativeness of disturbing evidence and evidence, although relevant, can be excluded from presentation in a trial before a jury if its probative value is substantially outweighed by the danger from unfair prejudice, confusing the issues, misleading the jury, considerations such as undue delay or needless presentation of cumulative evidence. . . .

The essence [in the *Montgomery* case] of what the trial judge admitted, the essential nature was that, apparently, evidence tended to show that the defendant in that case acted in a bizarre sexual nature and may have committed crimes by parading in the nude with an erection in front of minor children. That wasn't what he was charged with, though, those particular acts; but it was admitted to show that the defendant had a propensity in general or at least on that occasion to act indecently around the children. So, it was admitted; but it was later deemed to be inadmissible because it did not fit the relevancy test under the Rules of Evidence.

Here, there is little or no showing in the record that the children knew anything about this man or the parents in the home any indiscretions that they may have been involved with; and Defendant's Exhibit 1 that was admitted in the hearing doesn't prove otherwise.

If I would have seen maybe in that photograph one or two of the little children who have testified watching, maybe that would have changed this Court's mind. The Court is not going to chastise a defendant - - a defense strategy in just throwing dirt in general, but that's what this boils down to. It's not relevant. It does not connect in any way to the children being aware or knowing of those allegations that would have prompted them to be suggested in their - - from their testimony, that their testimony in this trial was a product of any

38

inappropriate actions that the father or anyone else in the household as a parent figure would have role modeled or inferred to the children to cause them to testify as they did.

It does not fit the relevance test. The State's objection is sustained.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Tex. R. Evid. 401. Evidence which is not relevant is inadmissible. Tex. R. Evid. 402. It is important, when determining whether evidence is relevant, that courts examine the purpose for which the evidence is being introduced. *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009). "It is critical that there is a direct or logical connection between the actual evidence and the proposition sought to be proved." *Id.*

Generally, a trial court's ruling excluding evidence, even when erroneous, is non-constitutional error. *Walters v. State*, 247 S.W.3d 204, 221 (Tex. Crim. App. 2007). Rulings excluding evidence, when erroneous, may rise to the level of constitutional error when the evidence "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). But the exclusion of evidence that would only "incrementally" further the defendant's defensive theory is not constitutional error. *See Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005); *Potier*, 68 S.W.3d at 665-66 (That the defendant was unable to present his case to

the extent and in the form he desired was not prejudicial where he was not prevented from presenting the substance of his defense to the jury.).

On this record, the trial court' ruling that Defense Exhibit 1 was not relevant was reasonable, so it does not fall outside the zone of reasonable disagreement. Further, even if the trial court erred in excluding the Facebook exhibits, the error was non-constitutional error because, at best, it would have done nothing more than incrementally further Louviere's defense, meaning his theory that Bethany and Mary were exposed to a sexual environment at Sherry and Chad's house. The defense presented other evidence to the jury in support of the defense's theory that Bethany and Mary were exposed to a sexual environment at Sherry and Chad's house, such as testimony from several of the witnesses regarding Bethany and Mary being exposed to explicit rap music and the movie *Sausage Party*, and Tammy testified that she walked in on Sherry and Chad having sex on the couch while the children were in their rooms. Even assuming the trial court erroneously excluded the Facebook exhibits, when viewed in light of the entire record, the exclusion of the exhibits was harmless. *See Potier*, 68 S.W.3d at 666. Accordingly, we overrule issue three.

Having overruled Louviere's appellate issues, we affirm the trial court's judgments.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on July 7, 2022
Opinion Delivered August 24, 2022
Do Not Publish

Before Kreger, Horton & Johnson, JJ.