

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00032-CR

JARED STEVEN LAWSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 29014

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

After a jury found Jared Steven Lawson guilty of indecency with a child by contact[1] and aggravated sexual assault of a child,[2] he was sentenced to fifteen years in prison on each count, with the sentences to run concurrently. Lawson appeals, asserting that (1) there was insufficient evidence to support his conviction for aggravated sexual assault of a child, (2) there was insufficient evidence to support his conviction for indecency with a child by contact, and (3) the trial court erroneously admitted hearsay statements contained in the sexual assault nurse examiner's (SANE) report. Because we find that there was sufficient evidence to support Lawson's convictions and that the trial court did not err when it admitted the SANE's reports in their entirety, we affirm both judgments of conviction.

## I. Background

Fourteen-year-old S.S.[3] testified that, in the early part of 2021, her younger twin sisters, K.W.1 and K.W.2,[4] wanted to speak to her about something Lawson had done to them. According to S.S., they seemed "[s]cared, almost lost, like they didn't know how to say it." Because Lawson was in the house, S.S. took the girls into her room and questioned them there. To prevent Lawson from coming into her room, S.S. told him that she was playing a game with

---

[1]*See* TEX. PENAL CODE ANN. § 21.11(a)(1). Pursuant to Section 12.42 of the Texas Penal Code, Lawson was indicted as a repeat offender on both counts.

[2]*See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(iii).

[3]We refer to the children and any family members by initials or pseudonyms in order to protect the confidentiality of the children involved. *See* TEX. R. APP. P. 9.10(a)(3).

[4]K.W.1 was born about twenty minutes before K.W.2. At the time of trial, the twins were nine years old. The alleged incidents occurred when they were around seven years old.

the girls. When she questioned them, S.S. recorded the conversation on her best friend's cell phone. Later, S.S. played the recording for Lawson to determine whether K.W.2 was telling the truth. Although Lawson denied the allegations, according to S.S., he tried to delete the recording. S.S. waited two days to tell her mother about what had happened "[b]ecause it was only [her] and [her] sisters, and [Lawson] was the only man there and [she] didn't want [them] to get hurt." S.S. said that Lawson's presence in their house scared her. S.S. conceded that she had never seen Lawson, "with [her] own eyes," be inappropriate with either K.W.1 or K.W.2. She said that, although Lawson made her feel uncomfortable, he had never "done anything" to her.

K.W.1 testified that Lawson had been her mother's friend for a long time and that he sometimes lived with them. K.W.1 said that she remembered Lawson hurting her and that he "really hurt[] [her] sister." K.W.1 identified the genitals on a diagram, referring to it as "[a] bad area." According to K.W.1, people are not supposed to touch your "bad area," but she said that Lawson had touched her "bad area" with his hand while she was wearing clothes. She said that it only happened on one occasion. K.W.1 said that she waited to tell her sister, S.S., what Lawson had done to her because she was scared to tell anyone. On cross-examination, K.W.1 agreed that Lawson had touched her quickly with his hand, not his fingers. When asked if she believed it was an accident, K.W.1 initially said that she did not know, and then later agreed that it might have been.

K.W.2 testified that Lawson had lived with her and that, "[a] long time ago,"[5] something had happened in the shed. Initially, K.W.2 shook her head in the negative when asked if she saw

[5]K.W.2 explained that, when she said a "long time ago," she meant "months ago."

3

Lawson in the courtroom, but shortly after that, she correctly pointed him out as being the man in the blue shirt. K.W.2 first recalled that Lawson told the family he was going to shoot them. K.W.2 said that Lawson had done something to her on three occasions that she had not liked and that she told S.S. about what happened. K.W.2 agreed that there were spots on her body that other people should not touch. When asked if Lawson had ever touched her on any of those places, K.W.2 nodded her head in the affirmative. She also stated that she referred to those places as "[p]rivate." According to K.W.2, Lawson had touched her on her private with his hands and had done "nasty stuff" to her with his private part. She nodded her head in the affirmative when asked if the "nasty stuff" amounted to what she told the SANE during her examination.

B.S., who is the mother of the three girls, testified that she had known Lawson for over twenty years. Lawson "was [her] very best friend." Lawson stayed with B.S. on several occasions. According to B.S., Lawson would intermittently leave her home and go stay with another friend, but then he would return.

B.S. learned of Lawson's behavior when S.S. asked her "to sit down and have a serious talk." B.S. immediately called K.W.1 into her bedroom, played the recording for her, and asked her if she wanted to talk about what happened. B.S. said, "[K.W.1] explained that [Lawson] came in the bathroom with her on one incident and touched her on her private areas on the outside only." K.W.1 also informed B.S. that she had seen Lawson "French kissing" K.W.2. K.W.1 also told B.S. that she had seen Lawson's clothes folded up on the floor in the girls' bedroom and that Lawson was on top of K.W.2. According to B.S., K.W.1 then "made a motion

4

like an up and down." When B.S. was asked to clarify her testimony, she explained that K.W.1 had gotten down on the floor and did a "push-up style motion." B.S. interpreted K.W.1's actions to mean "sexual activity of some kind."

In addition, K.W.1 told B.S. that, on one occasion, she saw Lawson throw away K.W.2's clothing. When B.S. asked K.W.1 to explain what she meant, K.W.1 told her that K.W.2's clothes had blood on them and that she believed that Lawson had hurt K.W.2. K.W.1 added, "He brought her -- he carried her in the house in a towel."

B.S. also testified that K.W.1 waited to tell her about what Lawson had done because she was afraid of him. According to K.W.1, Lawson told her that he would kill B.S. in her sleep and that he would "make sure [she] died." Lawson also told K.W.1 that he would burn their house down and then "they would be forced to stay there with him."

B.S. said that she took about ten minutes to "process" what K.W.1 had told her, and then she asked K.W.2 to come into the room.[6] K.W.2 told B.S. about Lawson kissing her and that Lawson made them touch a dog's genitals. K.W.2 also told B.S. that Lawson hurt her "no-no area." B.S. said that "no-no area" meant K.W.2's sexual organ. When asked if Lawson had touched her no-no area on the outside or the inside, K.W.2 indicated that he had touched the inside of her sexual organ with his fingers and his "no-no" parts. According to B.S., K.W.2 told her that Lawson had hurt her "no-no area" "lots of times." B.S. asked K.W.2 why she had not told her about Lawson's behavior sooner. K.W.2 said that she was afraid of him.

---

[6]K.W.1 had left the room.

5

After learning what had happened, B.S. told Lawson that he had two and a half weeks to remove his personal belongings from her house.[7] When B.S. asked him why he had hurt her daughters, Lawson initially responded by asking her what she was talking about. B.S. repeated the question, and Lawson again denied that he had done anything to them.

Angela Bates, a forensic interviewer at the Children's Advocacy Center of Paris, conducted interviews with K.W.1 and K.W.2. Bates explained that she had difficulty interviewing K.W.2 due to her lack of focus and inability to concentrate on the conversation.

Kim Basinger, who is a registered nurse and SANE, testified that, on September 17, 2020, she performed the SANE examinations of K.W.1 and K.W.2. Basinger said that, during K.W.1's examination, she appeared calm and quiet. Basinger reported that K.W.1 was dirty and had body odor. B.S. told Basinger that K.W.1 bled when she urinated. Basinger did not find any physical trauma to K.W.1, but she explained that lack of evidence of physical trauma was not unusual in cases such as this one. K.W.1 indicated that she had been sexually abused. Basinger noted, "Pt. states, 'Bad problems by a grown man – Jerod Lawson he did some bad stuff. He put his finger in my no (points to genitalia). It felt nasty and weird. On top of my clothes. He said he will kill my mom if I tell her.'"

Basinger testified that, during her examination, K.W.2 had difficulty sitting still, she kept changing the subject, and she tried to leave the room several times. K.W.2 "[t]alked baby talk." Her "[b]ody and clothing were filthy. Bottom of feet were caked black." Basinger did not find any physical trauma to K.W.2, but she explained that, in non-acute examinations, any injuries

---

[7]On the other hand, B.S.'s mother, Sandra, who was present during the conversation, retrieved a baseball bat from a vehicle, put it on Lawson's "Adam's apple, and told him that he better hope that he didn't touch her grandchildren."

6

sustained by a patient may have already healed and might not be visible. Basinger said that K.W.2 indicated to her that she had been sexually abused. Basinger wrote, "[P]t states, 'Jerod, he did sex with me[.] My private parts with his private part. One time, clothes on in the bathroom he unlocked it. Using the bathroom.'" S.S. told Basinger that K.W.2 had burning and bleeding around her genitals. According to Basinger, that condition could have been caused by an injury to the area or a urinary tract infection. K.W.2 was able to look at a diagram and identify the genitalia, referring to it as a "no-no."

## II.    Sufficiency of the Evidence

In his first and second points of error, Lawson asserts that there was insufficient evidence to support the jury's verdicts of guilt as to both charges.

### A.    Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts

7

to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.*

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* at 297 (quoting *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985))). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004))). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—

8

Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)) (citing *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004)).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* at 297 (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

**B.     Lawson's Conviction of Aggravated Sexual Assault of a Child Was Supported by Sufficient Evidence**

Here, Count II of the State's superseding indictment tracked the language contained in Section 22.021 of the Texas Penal Code, alleging that, on or about August 15, 2020, Lawson "did then and there intentionally or knowingly cause the female sexual organ of [K.W.2], a child who was then and there younger than fourteen (14) years of age, to contact the male sexual organ of [Lawson]."

In his first point of error, Lawson asserts that the State failed to present sufficient evidence to support the jury's verdict because there was no testimony from K.W.2 to establish the charged offense. According to Lawson, Article 38.07 of the Texas Code of Criminal Procedure "requires at least the victim's 'testimony.'"

Article 38.07(a) of the Texas Code of Criminal Procedure states that a conviction for, among other things, aggravated sexual assault of a child "is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the

9

defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred." TEX. CODE CRIM. PROC. ANN. art. 38.07 (Supp.). Subsection (b) of Article 38.07 states,

> (b)      The requirement that the victim inform another person of an alleged offense does not apply if at the time of the alleged offense the victim was a person:
>
> (1)      17 years of age or younger;
>
> (2)      65 years of age or older; or
>
> (3)      18 years of age or older who by reason of age or physical or mental disease, defect, or injury was substantially unable to satisfy the person's need for food, shelter, medical care, or protection from harm.

TEX. CODE CRIM. PROC. ANN. art. 38.07(b) (Supp.).

Lawson's reading of Article 38.07 is misguided. In *Martinez v. State*, 178 S.W.3d 806 (Tex. Crim. App. 2005), the Texas Court of Criminal Appeals explained:

> Article 38.07 protects the accused by creating a statutory corroboration requirement. Its purpose is almost exactly opposite to that of Article 38.072: this is a defendant-protecting statute, rather than a child-victim-protecting statute. It limits the circumstances in which the State may obtain a conviction for sexual offenses based on the testimony of a competent adult to situations in which: (1) the victim made an outcry within one year of the criminal act; or (2) there is other evidence that corroborates the victim's testimony.

*Id.* at 812 (footnotes omitted) (citations omitted). Those are not the circumstances of this case.

That said, in support of the State's case, Basinger testified that K.W.2 told her that "Jerod, he did sex with me[.] My private parts with his private part." Basinger memorialized K.W.2's statement in her SANE report, which was admitted into evidence. Lawson concedes that K.W.2's statement to Basinger was sufficient evidence to prove aggravated sexual assault of

10

a child, but he contends that her statement to Basinger was inadmissible hearsay. Yet, as we discuss below, K.W.2's statement was properly admitted.[8] Even if it were improperly admitted, the Texas Court of Criminal Appeals has expressly stated that "[o]ur review of 'all of the evidence' includes evidence that was properly and improperly admitted." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Connor v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001)). K.W.2 also testified that Lawson had done "nasty stuff" to her with his private part, and she affirmatively indicated that "nasty stuff" described what she had told Basinger during her SANE examination, that is, that Lawson had used his "private part" to have sex with her "private part."

In addition to K.W.2's testimony at trial and her statement to Basinger, S.S. and B.S. testified in regard to K.W.2's description of Lawson's actions, which included testimony that Lawson kissed K.W.2 and touched the inside of her sexual organ with his fingers and with his "no-no area" "lots of times." B.S. also explained that K.W.1 saw Lawson on top of K.W.2 in the girls' bedroom and that K.W.1 demonstrated what B.S. believed to have been sexual activity. S.S.'s and B.S.'s testimony certainly substantiated K.W.2's testimony and her statement to Basinger.

To the extent that Lawson complains of the language that K.W.2 used to describe the assault, his complaint is likewise without merit. Courts give wide latitude to the testimony given by a child victim of sexual abuse. *See Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990). A child victim's description of what occurred need not be precise, and she is not required

---

[8]We address Lawson's hearsay argument more fully in our discussion of his third point of error.

11

to express herself at the same level of sophistication as an adult would. *Id.* In this case, K.W.2's identification of male and female sexual organs as "private parts" and "no-no areas," as well as her explanation of Lawson's behavior, were adequate descriptions for a child of her age.[9]

K.W.2 described Lawson sexually assaulting her, and other witnesses confirmed K.W.2's version of events. We, therefore, conclude that the State presented sufficient evidence to support the jury's verdict that Lawson was guilty of aggravated sexual assault of a child.

We overrule Lawson's first point of error.

### C. Lawson's Conviction of Indecency with a Child by Contact Was Supported by Sufficient Evidence

In Count I of its superseding indictment, the State alleged that, on or about August 1, 2020, Lawson "did then and there, with the intent to arouse or gratify the sexual desire of [Lawson], engage in sexual contact with [K.W.1], a child younger than seventeen (17) years of age, by touching the female sexual organ of [K.W.1]." In his second point of error, Lawson contends that there was insufficient evidence to support his conviction of indecency with a child by contact because K.W.1 was unable to identify him in court as the perpetrator of the assault. We disagree.

At trial, K.W.1 was asked if she saw Lawson in the courtroom, to which she twice responded, "Huh-uh." The State then asked K.W.1 if she knew someone named Jared and, if so, if she knew his last name. K.W.1 nodded that she knew him and that his last name was Lawson. After that, K.W.1 indicated that "Jared" had done something to her that she did not like and that he had hurt her in the living room in the house by Wade Park. K.W.1 said that she referred to

---

[9]K.W.2 correctly identified male and female genitalia on a diagram and referred to them as "private part[s]."

genitalia as "a bad area" and that Lawson had touched her in her "bad area" with his hand while she had her clothes on. According to K.W.1, he only did it once, and she told her sister what he had done.

On re-direct examination, the following colloquy took place between K.W.1 and the State.

> Q.     I have one more question. All right. I still need you to look around and see if you see Jared in the courtroom. So we're going to start over here. Do you see anybody in this group of people that could possibly be Jared?
>
> A.     No.
>
> Q.     Okay. What about back here?
>
> A.     No.
>
> Q.     Do you see anybody at this table that could be Jared?
>
> A.     No.
>
> Q.     What about over here? In this group of people over here by the Judge, do you see anybody over there?
>
> A.     A police officer.
>
> Q.     There is a police officer over there. But anybody that could be Jared?
>
> A.     Maybe the one that's wearing a blue shirt.
>
> Q.     A blue shirt. Can you point at him?
>
> A.     (Witness complies.)
>
> Q.     Is there anything else about him that you can tell me about?
>
> A.     He has a mask and gloves.

13

Q. Okay.

[State's Attorney]: Can the record reflect that she has identified the Defendant?

THE COURT: [K.W.1], is the person you pointed to -- who was that?

[K.W.1]: Jared.

THE COURT: The record will so reflect.

Lawson contends that "the older twin identified the Defendant by his name only. When asked to identify him personally at trial, she was unable to do so." The record clearly reflects that K.W.1 did, in fact, identify Lawson in the courtroom. Moreover, and as K.W.1 pointed out at trial, Lawson was wearing a mask and gloves at the time, which would have made his identification more difficult.

Next, Lawson contends that, because K.W.1 was the only person who testified that Lawson touched her, she was the only person who could identify him at trial. An accused's identity may be established by direct or circumstantial evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) ("[T]he State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with reasonable inferences from that evidence."). Moreover, the lack of "in-court identification [does] not necessarily render the evidence insufficient on the issue of identity." *Couchman v. State*, 3 S.W.3d 155, 162 (Tex. App.—Fort Worth 1999, pet. ref'd).

In this case, the record shows that K.W.1 knew her assailant—he was her mother's "very best friend" and her family's part-time housemate. Despite her initial hesitancy, K.W.1 correctly

14

identified Lawson in the courtroom as the person who had inappropriately touched her with his hand or finger. In addition to K.W.1's in-court identification, several other witnesses identified Lawson at trial. First, B.S. testified that she knew Lawson because he had been her good friend for twenty years and had lived with her family on multiple occasions. B.S. testified that K.W.1 told her that Lawson touched her inappropriately. B.S. correctly identified Lawson in the courtroom, stating that he was wearing "[a] light blue long sleeve shirt, glasses and khaki pants." In addition, S.S., who testified that K.W.1 had told her that Lawson inappropriately touched her, also identified Lawson in the courtroom, stating that he was wearing a blue striped shirt. Initially, K.W.2 affirmatively nodded when asked if she saw Lawson in the courtroom, and immediately after that, she pointed at him and verbally identified him as the person wearing a blue shirt. Twelve-year-old Joe Jones testified that he knew Lawson because he was his mother's "ex a while ago" and that Lawson had lived with them "a long time ago." According to Jones, "[Lawson] made [Jones] put [Lawson's] penis in [Jones's] mouth" while they were in the bathroom. Jones correctly identified Lawson as the "person in the brown pants and the blue shirt."[10] Accordingly, the evidence presented in this case was sufficient to identify Lawson as the person responsible for committing the charged offense.

We overrule Lawson's second point of error.

## III. The SANE's Reports Were Admissible

In his third point of error, Lawson argues that the trial court erroneously admitted hearsay statements contained in the SANE's reports of K.W.1 and K.W.2. We disagree.

---

[10]Much like K.W.1, Jones had some difficulty identifying Lawson because he was wearing a mask.

15

**A. Waiver**

The State maintains that Lawson waived this issue on appeal because, other than making a broad-based hearsay objection to the admission of the SANE's reports at trial, he did not specifically identify the portions to which he objected. The State argues that the trial court was not required to "[s]ort [t]hrough" the reports to make that determination.

"It is well established that, in order to preserve an issue for appeal, a timely objection must be made that states the specific ground of objection, if the specific ground was not apparent from the context." *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006). "A general or imprecise objection may be sufficient to preserve error for appeal, but only if the legal basis for the objection is *obvious* to the court and to opposing counsel." *Id.* "When the objection is not specific, and the legal basis is *not* obvious, it does not serve the purpose of the contemporaneous-objection rule for an appellate court to reach the merits of a forfeitable issue that is essentially raised for the first time on appeal." *Id.*

Although Lawson did not direct the court to the specific page number or paragraph of which he complained, it is clear from the record that the parties and the court understood which particular portions of the reports were at issue. After Lawson's hearsay objection and outside the presence of the jury, the court stated, "Before the Court is a hearsay objection to State's Exhibits 4 and 5." It then continued, "So it is -- so what I'm looking at is State's Exhibit 4, page 9. State's Exhibit 5, pages 9 and 11."

Page 9 of State's Exhibit 4, which was the SANE's report of K.W.2, stated, "[P]t states, 'Jerod, he did sex with me[.] My private parts with his private part. One time, clothes on in the

16

bathroom he unlocked it. Using the bathroom. Is it almost time to leave. Do you have snacks, can I go swing.'"

Page 9 of State's Exhibit 5, which was the SANE's report of K.W.1, stated, "Pt. states, 'Bad problems by a grown man – Jerod Lawson he did some bad stuff. He put his finger in my no no (points to genitalia). It felt nasty and weird. On top of my clothes. He said he will kill my mom if I tell her.'" Page 11 of State's Exhibit 5 states, in relevant part, "[M]om states, 'Will you tell me what she says. Can I get a copy of the charts.' Explained to mom that I could not do that but I would tell her the results of the exam. Told mom to follow up with Dr. Katrell for 'urinary bleeding.'" In addition, page 11 read, "[A]ccused was mom's best friend who lived in the house [with] mom and her children."

After questioning Basinger about the rationale behind her notes, the trial court overruled Lawson's objections, and the trial proceeded. On appeal, Lawson continues to complain about the contents of State's Exhibit 4, page 9, and State's Exhibit 5, page 9. Consequently, we find that Lawson's hearsay objection, which was followed by the State's explanation of its intent to use Rule 803(4), was sufficient to preserve Lawson's complaint on appeal. Because we find that Lawson's issue is preserved, we address it on the merits.

### B. Standard of Review

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable

people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

### C. Discussion

Hearsay is a statement, other than one made by the declarant while testifying at trial or a hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is not admissible except as provided by statute, the rules of evidence, or other rules prescribed pursuant to statutory authority. TEX. R. EVID. 802. There is no question that Basinger's report included hearsay; the question is whether the hearsay was admissible. Here, Lawson lodged a hearsay objection to State's Exhibits 4 and 5. "Once the opponent of hearsay evidence makes the proper objection, it becomes the burden of the proponent of the evidence to establish that an exception applies that would make the evidence admissible in spite of its hearsay character." *Taylor v. State*, 268 S.W.3d 571, 578–79 (Tex. Crim. App. 2008).

Here, the State specifically informed the trial court that it sought to utilize Rule 803(4), which creates an exception to the hearsay rule. In order for a statement to be admissible under Rule 803(4), the proponent of the evidence must show that (1) the declarant was aware that the statement was made for the purposes of medical treatment or diagnosis and that the appropriate treatment or diagnosis depended on the veracity of the statement and (2) the specific statement

18

offered was also "pertinent to . . . treatment," that is, it was reasonable for the medical provider to rely on that statement in treating the declarant. TEX. R. EVID. 803(4); *see Taylor*, 268 S.W.3d at 589.

At trial, the court asked several questions of Basinger, who performed K.W.1's and K.W.2's physical examinations, and then prepared the SANE's reports that contained her findings.

> THE COURT: The patient in Exhibit 4 is who?
>
> [BASINGER]: [K.W.2].
>
> THE COURT: So the information that you have provided in the State's Exhibit Number 4 -- and you've also got some quotation marks, and the quotation marks as I understand from you testifying previously means that you have written down exactly what the patient told you, is that correct?
>
> [BASINGER]: That's correct.
>
> THE COURT: The patient, again, was [K.W.2]?
>
> [BASINGER]: That's correct.
>
> . . . .
>
> [THE COURT]: Again, you've got quotation marks identifying that this was an actual verbatim transcription of what the patient told you, is that correct?
>
> [BASINGER]: That is correct.
>
> [THE COURT]: The patient in Exhibit 5 is who?
>
> [BASINGER]: [K.W.1]
>
> [THE COURT]: Thank you. Why do you ask the history?
>
> [BASINGER]: We ask all patients why they came to see us. That history guides us to know where to look for possible evidence, possible injury, possible

19

> disease processes. It helps us to formulate our nursing diagnosis and our plan of care in how we're going to take care of them. Without a history we would be going into it blind.

After the court asked Basinger a few more questions, it overruled Lawson's objection to the SANE's reports concerning both of the girls.

Specifically, Lawson asserts that the children's statements regarding his identity, which were memorialized on pages 9 and 11 of State's Exbibits 4 and 5, amounted to inadmissible hearsay because Lawson's identity was "wholly irrelevant to [the] diagnosis or treatment of the [children]." We disagree.

Basinger testified that the purpose of the SANE examination was to diagnose and treat K.W.1 and K.W.2. She also explained that the physical examinations consisted of taking a history, performing a head-to-toe physical assessment of the patient, and performing a genital examination for signs of trauma or sexually transmitted diseases. Additionally, the record reflects that Basinger did, in fact, conduct the children's physical examinations to determine whether they had suffered any injuries due to the assaults and, if so, what treatment, if any, should follow.

In support of his contention that the identity of the perpetrator "would seldom be pertinent," Lawson directs us to *U.S. v. Iron Shell*, 633 F.2d 77 (8th Cir. 1980). In that case, the appellate court noted that the victim's statement did *not* include information regarding the identity of the perpetrator. It then observed, in dicta, by referencing the Advisory Committee Note, that such information would "seldom, if ever," be relevant to the diagnosis of the victim or her treatment. *Id.* at 84.

20

Yet, in 2008, the Texas Court of Criminal Appeals, in *Taylor*, 268 S.W.3d at 580–81, referred to the appellate court's finding in *Iron Shell* but then followed with a discussion of *United States v. Renville*, explaining:

> In *United States v. Renville*,[11] the Eighth Circuit squarely confronted the question whether an eleven-year-old victim's statement made to a physician during an examination following a sexual assault that actually identified her assailant was admissible under Rule 803(4). Notwithstanding its dicta in *Iron Shell*, the Eighth Circuit held in *Renville* that "[s]tatements by a child abuse victim to a physician during an examination that the abused is a member of the victim's household *are* reasonably pertinent to treatment."

*Taylor*, 268 S.W.3d at 581 (quoting *Renville*, 779 F.2d at 436).[12]

When applying the medical treatment exception to cases involving child abuse, Texas appellate courts have also permitted the victim's statements concerning the identity of the perpetrator to be admitted because treatment of child abuse must begin with removing the child from the abusive setting. *Guzman v. State*, 253 S.W.3d 306, 308–09 (Tex. App.—Waco 2008, no pet.); *Beheler v. State*, 3 S.W.3d 182, 189 (Tex. App.—Fort Worth 1999, pet. ref'd); *Molina v. State*, 971 S.W.2d 676, 683–84 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd); *Fleming v. State*, 819 S.W.2d 237, 247 (Tex. App.—Austin 1991, pet. ref'd) (per curiam); *Macias v. State*, 776 S.W.2d 255, 258–59 (Tex. App.—San Antonio 1989, pet. ref'd). This is especially so in cases involving family members or members of the same household because "it presents an

---

[11]779 F.2d 430 (8th Cir. 1985).

[12]The medical treatment "exception is based on the assumption that the patient understands the importance of being truthful with the medical personnel involved to receive an accurate diagnosis and treatment." *Bautista v. State*, 189 S.W.3d 365, 368 (Tex. App—Fort Worth 2006, pet. ref'd); *see Taylor*, 268 S.W.3d at 580. However, unlike statements made to nonmedical professionals, which require affirmative evidence in the record on the issue of veracity, "courts can infer from the record that the victim knew it was important to tell a SANE the truth in order to obtain medical treatment or diagnosis." *Franklin v. State*, 459 S.W.3d 670, 677 (Tex. App.—Texarkana 2014, pet. ref'd). Regardless, Lawson does not argue this point; instead, he argues only that identifying him as the perpetrator was not pertinent to the girls' diagnoses or their treatment.

environmental and safety issue that could frustrate diagnosis and treatment." *Gutierrez v. State*, 630 S.W.3d 270, 280 (Tex. App.—Eastland 2020, pet. ref'd).

That is the case here. Lawson, a person B.S. referred to as her "very best friend," had been acquainted with, and was often around, the twins and their older sister. The record shows that, at various intervals over a significant period of time, Lawson lived with B.S. and her daughters. According to the SANE report, Basinger was aware of the children's connection to Lawson because she noted that the "accused was mom's best friend who lived in the house [with] mom and her children." Consequently, Lawson's identity was crucially important because the obvious first step in the children's treatment was to eliminate any future contact with their abuser.

On this record, we conclude that it is at least within the zone of reasonable disagreement that the twins' histories, including the complained-of statements, were taken for the purpose of medical treatment or diagnosis. Therefore, we hold that the trial court did not abuse its discretion when it admitted the SANE reports in their entirety.

We overrule Lawson's third point of error.

22

## IV. Conclusion

We affirm the trial court's judgments of conviction.

Charles van Cleef
Justice

Date Submitted: August 23, 2022
Date Decided: September 27, 2022

Do Not Publish